Trevor STAFF, Plaintiff,

v.

PALL CORPORATION, Eric Krasnoff, Tom Gsell, Pat Lowy, Rich Salinaro, Joseph Zanetti, John Sipsas, and Chuck Duthie, Defendants.

No. 99CV0798.

United States District Court, S.D. New York.

Nov. 13, 2002.

Daniel Cherner, New York City, for Plaintiff.

David I. Rosen, Miranda Mitchell, Clifton, Budd & DeMaria, LLP, New York City, Mary Ann Bartlett, Assistant General Counsel & Secretary Pall Corporation, East Hills, NY, for Defendants.

## ORDER

BERMAN, District Judge.

### I. Background

Trevor Staff ("Staff" or "Plaintiff") filed this action against his former employer, Pall Corporation ("Pall") and individually named defendants who held various managerial and supervisory positions within Pall (collectively, "Defendants") on or about February 3, 1999. Plaintiff alleges, among other things, that, on the basis of "race,

color and national origin," Defendants discriminated and retaliated against him, and subjected him to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. (1994) ("Title VII"), 42 U.S.C. § 1981, and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et. seq., as amended ("NYSHRL"). *See* Second Amended Complaint dated June 19, 2000.

On July 26, 2001, Defendants moved for summary judgment ("Defendants' Motion") under Rule 56(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[1] On or about September 8, 2001, Plaintiff responded and cross-moved for summary judgment ("Plaintiff's Response and Cross–Motion") on Defendants' counterclaims, which alleged breach of contract and breach of duty of loyalty ("Counterclaims"). On October 16, 2001, Defendants sent a letter to the court withdrawing their Counterclaims ("October 16 Letter"), and filed a reply memorandum. On or about November 8, 2001, Plaintiff filed a surreply.

On October 17, 2002, Magistrate Judge Theodore H. Katz, to whom the matter had been referred, issued a Report and Recommendation ("Report"), recommending that Defendants' Motion be granted. Plaintiff filed objections to the Report on October 26, 2002 ("Plaintiff's Objections"). **For the reasons stated below, the Report is adopted in all respects and Defendant's Motion is granted.**

### II. Standard of Review

A district court evaluating a Magistrate's report may adopt those portions of the report to which no "specific, written objection" is made, as long as

---

1. Defendants, on June 7, 1999, filed a motion to dismiss which resulted in an Order of this Court dated March 31, 2000.

those sections are not clearly erroneous. Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Greene v. WCI Holdings Corp.,* 956 F.Supp. 509, 513 (S.D.N.Y.1997). "Where a party makes a 'specific written objection' within '[ten] days after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." *Cespedes v. Coughlin,* 956 F.Supp. 454, 463 (S.D.N.Y.1997) (quoting *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y. 1988).

## III. Analysis

The Court has conducted a *de novo* review of the record herein, including, among other things, the Report, Plaintiff's Objections, and applicable legal authorities. The Court adopts the Magistrate Judge's findings of fact as supported by the record and concludes that Magistrate Katz's legal determinations are correct in all material respects.

### *Plaintiff's Objections*

In his objections, Plaintiff raises substantially the same arguments as were raised in Plaintiff's Response and Cross–Motion. Plaintiff's Objections do not provide a basis for departing from the Report's recommendations.

**2.** "Claims under ... § 1981 are analyzed under the same framework as claims brought pursuant to Title VII," *see McLee v.Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997), and New York courts apply similar standards as those applied by Federal courts in assessing discrimination and retaliation claims. *See, e.g., Smith v. Xerox Corp.,* 196 F.3d 358, 363

### Discrimination Claims

Discrimination claims under Title VII, as pointed out by Magistrate Katz, are often analyzed using the three step burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] Under *McDonnell,* a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate "a legitimate, non-discriminatory reason" for the employment action. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "[O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the presumption raised by the *prima facie* case is rebutted and drops from the case." *Id.* The plaintiff "must [then] be afforded the opportunity to prove, by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 143, 120 S.Ct. 2097 (internal quotations omitted). "The test for summary judgment is [ultimately] whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

In order to make out a *prima facie* case of discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful dis-

n. 1 (2d Cir.1999) ("claims under the NYSHRL are analyzed identically to claims under ... Title VII, [and consequently] the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under ... Title VII") (citations omitted).

crimination. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir. 1997).

Plaintiff argues that a prima facie case of discrimination was established in connection with both his transfer to the Manufacturing Engineering Department in or about March 1998 and his "very small [salary] increases." Plaintiff's Objections at 7. Plaintiff contends that his "transfer had 'an attendant negative result, a deprivation of a position or an opportunity,'" *id.* at 2 (quoting *Patrolmen's Benevolent Ass'n of the City of New York v. City of New York*, 74 F.Supp.2d 321, 335 (S.D.N.Y.1999)), and amounted to an adverse employment action. As the Magistrate noted, Plaintiff's transfer did not constitute an adverse employment action. Staff did not "suffer a decrease in salary or fringe benefits," "his duties remained largely unchanged," and he failed to offer any evidence, "other than his own conclusory opinion," to support the contention that the transfer was "tantamount to a demotion and had detrimental effects on his career." Report at 26. Following a very thorough analysis, Magistrate Katz correctly determined that Plaintiff failed to establish a prima facie case of discrimination with respect to his transfer. *Id.* at 29.

Plaintiff argues that he was similarly situated to two co-employees, Daniela Terbancea ("Terbancea") and Moira Bilich ("Bilich"), but they "received massive salary increases as opposed to [his] very small increases, and ... such action was taken with an intent to reward and promote the white individuals... and keep[ ] Mr. Staff in place." Plaintiff's Objections at 7. While noting that there "was no evidence suggesting that there was disparate treatment in the salaries of Staff and Terbancea," the Magistrate also determined that, with respect to Bilich, Plaintiff had established a prima facie case, Report at 34–35, but that Defendants' legitimate, non-dis-

criminatory reason for any disparity was not a pretext. *Id.* at 36. Bilich's work was "consistently 'outstanding.'" *Id.* at 37. "Plaintiff [did not point] to a scintilla of evidence indicating that Defendants' explanation for giving Plaintiff a guideline pay increase, and for awarding a somewhat higher increase to Bilich, is a pretext for discrimination." *Id.*

**Retaliation Claims**

To establish a prima facie case of retaliation, a plaintiff must establish (1) that he was engaged in a protected activity under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) a causal connection between the adverse action and the protected activity. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir.2001).

Plaintiff claims that he received a negative performance appraisal and was later terminated in retaliation for filing a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") on November 25, 1998. "It is impossible to dispute the fact that Mr. Staff's protected activity preceded [both] the negative performance appraisal and termination; thus, Mr. Staff has made out a prima facie case of retaliation." Plaintiff's Objections at 9. As the Magistrate noted, "there is no basis to conclude that the [Plaintiff's performance appraisal] was negative" and, in any case, "no evidence demonstrating that it had unfavorable attendant circumstances, [so] it cannot be considered an adverse employment action." Report at 41–42. Plaintiff thereby failed to establish a prima facie case of retaliation with respect to his negative performance appraisal.

With respect to Plaintiff's termination claim, the Magistrate agreed that Plaintiff made out a prima facie case of retaliation, but found that Plaintiff failed to establish pretext. Plaintiff does not point to any

"evidence that would suggest that his termination was a result of impermissible retaliation .... [T]here is nothing in the record that would permit a reasonable finder of fact to conclude that Plaintiff's termination occurred in retaliation for his complaint to the EEOC." *Id.* at 49–50.

**Plaintiff's Cross–Motion for Summary Judgment**

Plaintiff claims unpersuasively that "Magistrate Katz failed to even remark on Plaintiff's motion for Summary Judgment and Other Relief." Plaintiff's Objections at 11. However, the Report clearly states that "Defendants have voluntarily withdrawn these claims, rendering Plaintiff's cross-motion moot." Report at 2; *see also* October 16 Letter.

## IV. Conclusion

The Court adopts Magistrate Katz's Report in all respects and, for the reasons stated therein and herein, grants Defendant's motion for summary judgment. The Clerk is respectfully requested to close this case.

## REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

Trevor Staff ("Plaintiff" or "Staff") brings this action against his former employer, Pall Corporation ("Pall"); Pall's Chief Executive Officer, Eric Krasnoff ("Krasnoff"); Senior Vice President, Tom Gsell ("Gsell"); Human Resources employee, Pat Lowy ("Lowy"); and various former supervisors, including Richard Salinaro, Product Manager, Research and Development ("Salinaro"); Joseph Zanetti, Director of Engineering Manufacturing ("Zanetti"); John Sipsas, Associate Director in Research and Development ("Sipsas"); and Chuck Duthie, Staff's immediate supervisor at the time of his termination ("Duthie"). Plaintiff alleges discrimination on the basis of race, color, and national origin in the form of disparate treatment and a hostile work environment, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 (" § 1981").[1] In addition, Plaintiff alleges race, color, and national origin discrimination under the New York State Executive Law § 296 ("New York State Human Rights Law" or "NYSHRL").

After a period of extensive pre-trial discovery, Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has cross-moved for summary judgment on Defendants' counterclaims alleging breach of contract and breach of the duty of loyalty. However, Defendants have voluntarily withdrawn these claims, *see* Defendants' letter from Domenique Camacho, Esq. to the Court, Oct. 16, 2001, rendering Plaintiff's cross-motion moot. Defendants' motion for summary judgment has been referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and Rule 72.1(a) of the Local Civil Rules of the Southern District of New York. For the reasons set forth below, I respectfully recommend that Defendants' motion for summary judgment be granted.

---

**1.** Plaintiff also asserted claims for breach of contract, fraud, defamation, and intentional infliction of emotional distress, as well as violations of 42 U.S.C. §§ 1985 and 1986. The Court (Berman, J.) dismissed Plaintiff's claims for breach of contract, fraud, and defamation, and permitted Plaintiff to withdraw his claims brought under 42 U.S.C. §§ 1985 and 1986, as well as his claim of intentional infliction of emotional distress. *See* Order, Mar. 31, 2000. The Court subsequently dismissed all claims against John Sipsas. *See* Case Management Plan, June 13, 2000.

## BACKGROUND

Trevor Staff is a Jamaican-born, black male. Pall Corporation is a New York corporation engaged in the business of designing, manufacturing, and marketing filters and other fluid clarification systems. Pall serves a global customer base with projects that are used to purify raw materials, keep equipment running efficiently, ensure product quality and clean up and minimize waste.

Plaintiff worked at Pall from 1983 to 1999. During his tenure there, he reported to approximately nine different managers, including Gsell, Salinaro, and Duthie. Staff was initially hired in September 1983, as a chemist in the Research and Development Department ("R & D"), and was assigned to the Membrane Development area. In January 1989, he was promoted to the position of R & D Supervisor. Staff alleges that the period of six years that it took him to achieve this promotion was in excess of what other employees at Pall had experienced, a fact which he attributes to discrimination.

As an R & D supervisor, Staff did not initially supervise any other employees, but in 1990, another chemist, Moira Bilich ("Bilich"), began working under his supervision. Until 1993, Plaintiff managed a project to develop a new membrane, called a Polyethersulfone Ultrafiltration Membrane (PESO).

In the summer of 1993, Sipsas, Staff's supervisor at the time, informed Staff that Bilich would be taking over the PESO project. In 1994, Sipsas assigned Staff to manage "semi-works" operations for the Polyvinyldene Fluoride Membrane (PVM) project. In that role, Staff supervised the casting line, and released materials for sale to customers. He was also responsible for addressing product quality issues and preparing necessary documentation that would enable the manufacturing department to produce products according to specification, without R & D's supervision.

In 1995, after being told that he had managed the PVM project successfully, Staff requested a raise, and received a salary increase slightly in excess of Pall's guidelines. In Staff's view, the raise was substantially less than he deserved, and was a result of discrimination.

In March 1996, at the time he was due for a performance review, Staff asked Gsell to promote him to Project Manager, which Gsell did. Staff contends that, as compared to other employees, his promotion was unduly delayed. After some disagreements with management, Staff received a pay raise which Staff contends was inadequate. Staff alleges that until his promotion, all Project Managers were given offices and employees to supervise, while he was given neither. Staff alleges that he was informed that there had been a change of policy with regard to offices.

In December 1996, Staff was removed from a project he had been supervising, a new program growing out of the PVM project, known as the 20 nanometer or "20 NM" project. Staff's duties were transferred to Daniela Terbancea ("Terbancea"), an employee who Staff helped train. Staff claims that this decision was also motivated by racial prejudice.

In 1998, as part of a general corporate reorganization, senior management at Pall decided that R & D should minimize its involvement in semi-works operations and focus on new product development. In March 1998, Zanetti, a Director in the Manufacturing Engineering Department, asked Staff to transfer to his department and oversee PVM production. Staff contends that when he asked his supervisor, Salinaro, about what new projects there would be in R & D, Salinaro lied to him and stated that he did not anticipate any future projects. Staff accepted the trans-

fer to Manufacturing Engineering, believing that he had no choice, and was given the title of Mechanical Engineer. He began reporting to Duthie. Staff claims that the transfer to Manufacturing Engineering was a demotion. Staff viewed his new title as a diminution in status, and claims that Zanetti had assured him that his title of Project Manager would not change. Defendants deny that such a promise was made. Moreover, they contend that the Manufacturing Engineering Department was structured differently from R & D, and that responsibilities in the two departments did not correspond with the same job titles. On November 25, 1998, believing that the transfer was detrimental to his career, Staff filed a complaint with the EEOC claiming racial discrimination.

In December 1998, Staff received a performance review which he contends was negative. A somewhat heated exchange ensued between Staff and his supervisor via e-mail. In 1999, Pall went through restructuring, and three employees in the Manufacturing Engineering Department were released, including Staff. A fourth engineer was transferred to a vacant position in the Maintenance Department. Staff alleges that his poor performance appraisal and termination were motivated by retaliation for his lodging a complaint with the EEOC.

## DISCUSSION

### I. *Statutes of Limitations*

Defendants contend that many of Staff's claims are time-barred under Title VII, § 1981, and the NYSHRL.

Under Title VII, a claimant must file an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC") within either 180 or 300 days after an alleged unlawful employment practice occurs. *See* 42 U.S.C. § 2000e–5(e)(1). Contrary to Defendants' assertion, in New York plaintiffs have 300 days to file.[2] The statute of limitations in New York for claims brought both under § 1981 and the NYSHRL, is three years from the date the claim accrues. *See* N.Y.C.P.L.R. §§ 214(2), 214(5); *King v. American Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir.2002) (three year statute of limitations for a § 1981 claim brought in New York); *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 464 (2d Cir.1997) (three year statute of limitations for actions brought under NYSHRL).

In this case, Staff filed a complaint with the EEOC on November 25, 1998. Therefore, in the absence of any applicable exception to the filing deadline, any claims brought under Title VII that accrued before January 29, 1998 are time-barred. Staff filed this action on February 3, 1999; thus, any claims that accrued before February 3, 1996 are also time-barred under § 1981 and the NYSHRL, in the absence of an exception to the statute of limitations.

■ Plaintiff argues, however, that these limitations periods are inapplicable in this case, and seeks resort to the "continuing violation" exception. Under this exception, a plaintiff who files a complaint about a continuing policy of discrimination extends the limitations period for all discriminatory acts committed under that policy, whether or not they occurred outside the limitations period, so long as one dis-

---

**2.** A claim must generally be filed within 180 days after the alleged discriminatory practice, unless the practice occurs in a state which has laws prohibiting the sort of discrimination of which a plaintiff complains, and also provides a state agency to enforce such laws.

If it does, the claimant has 300 days to file with the EEOC. 42 U.S.C. § 2000e–5(e) (1994). *See also Dezaio v. Port Auth. of New York and New Jersey*, 205 F.3d 62, 64 (2d Cir.2000); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 (2d Cir.1999).

criminatory act occurred within the limitations period. *See Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir. 2001); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997); *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir. 1993).

While there had been some disagreement among courts as to what types of discriminatory acts amount to a pattern or policy that triggers the continuing violation doctrine, a recent Supreme Court decision has largely resolved the issue. In that case, *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court considered a claim of racial discrimination and retaliation under Title VII. The Court differentiated the plaintiff's claims based on whether they alleged discrete acts, on the one hand, or alleged a hostile work environment, on the other. As the Court explained:

> [T]he statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. . . . [C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.

536 U.S. at ——, 122 S.Ct. at 2068. The Court clarified the distinction between the two types of claims as follows:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that 'occurred' within the appropriate time period . . . . Hostile environment

claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative affect of individual acts.

*Id.* at 2073 (citations omitted).

■ The continuing violation exception applies to a hostile work environment claim because of its intangible, but continuing nature. When a court is presented with allegations of more tangible adverse employment actions, however, the reasons for the exception cease to exist. As the Second Circuit has noted, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert,* 10 F.3d at 53.

In *Morgan,* the Court identified the following "discrete" employment actions which are not subject to the continuing violation exception: termination, failure to promote, denial of transfer, or refusal to hire. *See Morgan,* 536 U.S. at ——, 122 S.Ct. at 2073. Similarly, the Second Circuit has held that the denial of an increased pay grade does not amount to a continuing violation. *Lightfoot,* 110 F.3d at 907.

■ Plaintiff has asserted a hostile work environment claim in his Complaint. His hostile work environment claim is limited, however, to his allegations that he was not given an office or employees to supervise when he became a Project Manager in 1996, that he was lied to by a supervisor on a particular occasion in 1998, and that he was accused of insubordination in 1999. *See* Plaintiff's Memorandum of

Law ("Pl.'s Mem.") at 13–14. All of the other discriminatory acts he alleges, such as delayed promotions, inadequate pay raises, and a discriminatory transfer, were decisions made by different supervisors over a period of many years. Although he makes the conclusory assertion that they were committed pursuant to a discriminatory policy, he has submitted no evidence of such a policy, and the acts are precisely the type of discrete acts which the Supreme Court and Second Circuit have determined are not subject to the continuing violation doctrine.

Accordingly, any of Plaintiff's claims under Title VII alleging discriminatory acts such as the denial of a promotion, an inadequate raise in salary, and job transfer, before January 29, 1998, are time-barred.

The question remains, however, whether the Supreme Court's decision in *Morgan* is applicable to Staff's § 1981 and state law claims. All of the discriminatory acts Plaintiff complains about appear to be claimed as violations of Title VII, Section 1981, and the NYSHRL. Neither Plaintiff nor Defendants have addressed the applicability of the continuing violation exception to Plaintiff's § 1981 and state law claims. The parties' failure to distinguish between the various statutes notwithstanding, there is ample justification to extend the reasoning in *Morgan* to Plaintiff's § 1981 and state law claims.

Both the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (method of analysis and scheme of proof for *McDonnell Douglas/Burdine*-type disparate treatment claims is identical under § 1981 and Title VII); *Hawkins v. 1115 Legal Service Care,* 163 F.3d 684, 693 (2d Cir.1998) (retaliation claims analyzed using same standards under Title VII and § 1981). Al-though this Court's independent research failed to identify many cases addressing the continuing violation doctrine in the context of a § 1981 claim, two cases which were found make no distinction between § 1981 and Title VII claims. *See Delaware State College v. Ricks,* 449 U.S. 250, 257–58, 101 S.Ct. 498, 503–504, 66 L.Ed.2d 431 (1980) (analyzing claim of continuing violation, Court found it inapplicable on the facts under both Title VII and § 1981); *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 79 (E.D.N.Y.2002) (continuing violation doctrine applies to both Title VII and § 1981). Because the primary differences between the two statutes pertain to the breadth of protected classes, employers covered, and the statutes of limitations, rather than to the substantive elements of a claim or the proof models employed to substantiate a cause of action, it follows that the distinction drawn in *Morgan* between hostile work environment claims and claims of discrete acts of discrimination should apply equally to § 1981 disparate treatment claims.

Similarly, there is virtually no difference between the New York State Human Rights Law and federal employment discrimination laws, either in the available causes of action, burden-shifting framework, or underlying policies. *See, e.g., Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001) (discrimination claims under NYSHRL evaluated using same analytic framework used in Title VII actions); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000) ("identical standards" apply to employment discrimination claims brought under Title VII and the NYSHRL); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000) (consideration of claims brought under NYSHRL "parallels the analysis used in Title VII claims"); *Smith v. Xerox Corp.,* 196 F.3d 358, 363 n. 1 (2d Cir.1999) ("claims under the NYSHRL are analyzed

identically to claims under … Title VII"). In addition, at least one federal court has analyzed the continuing violation doctrine using identical standards with respect to Title VII, § 1981, and the NYSHRL. *See Everson,* 216 F.Supp.2d at 79.

Accordingly, the Court concludes that the reasoning of *Morgan* with respect to the continuing violation exception should apply to claims brought under the NYSHRL as well.

We now turn to a review of Plaintiff's specific claims and their timeliness. Plaintiff has not made the work of this Court easy, insofar as he asserts a myriad of grievances arising over a period of sixteen years; in many instances he fails to clearly articulate his claims, and to specify the dates of alleged acts of discrimination.

The Court gleans from the totality of the record, eight alleged incidents of disparate treatment or retaliation, two of which are time-barred under all three statutes, and others of which are time-barred only under Title VII:

1) Delayed promotion to, and underpayment as, an R & D director, prior to 1989—time-barred under all three statutes.

2) Inordinate delay in promotion to position of Project Manager—time-barred under all three statutes. Plaintiff was promoted to Project Manager in March 1996. He claims that he should have been promoted earlier in his career. Thus, the alleged discrimination took place prior to 1996.

3) Inadequate salary as Project Manager, in March 1996—time-barred under Title VII.

4) Failure to be given office or supervision of subordinate employees, in March 1996—time-barred under Title VII.

5) 20NM project transferred to Terbancea, in December 1996—time-barred under Title VII.

6) Transfer to Manufacturing Engineering, in March 1998—timely.

7) Negative performance appraisal/retaliation, in December 1998—timely.

8) Retaliatory termination on October 7, 1999—timely.

Accordingly, the Court recommends that claims 1 and 2 be dismissed as time-barred under all three statutes, and that claims 3 through 5 be addressed only under § 1981 and the NYSHRL. As for Plaintiff's hostile work environment claim, which includes acts committed in 1998 and 1999, time-bar is not an issue because of the continuing violation doctrine. This claim will therefore be addressed on its merits.

## II. Summary Judgment Standard

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The moving party must show that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2553–54; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Sologub,* 202 F.3d at 178.

On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975); *see also Flaherty v. Lang*, 199 F.3d 607, 615 (2d Cir.1999); *Cronin*, 46 F.3d at 203. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Cronin*, 46 F.3d at 203. However, "summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149 (2d Cir. 1998) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552) (internal citations omitted). "[I]n order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor," and "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001) (internal quotations omitted).

### III. Plaintiff's Disparate Treatment Claims

#### A. Legal Standards

Under Title VII, "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).

The standards for adjudicating a Title VII disparate treatment claim are well established. Moreover, as discussed, the analysis of disparate treatment claims under both § 1981 and the NYSHRL proceeds identically to those brought under Title VII.

■ In a disparate treatment case, the Plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Farias*, 259 F.3d at 98; *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996). To satisfy his initial burden, a plaintiff alleging disparate treatment must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position for which he was not hired or, as alternatively described by some courts, he satisfactorily performed the duties required by his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in a protected class. *See Farias*, 259 F.3d at 98; *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

Although the plaintiff's initial burden in establishing a prima facie case of discrimination is minimal, it is not entirely without substance. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir. 1994); *Chertkova*, 92 F.3d at 90. "In determining whether the plaintiff has met the de minimis initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of

fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" *Cronin,* 46 F.3d at 204 (quoting *Chambers,* 43 F.3d at 38). However, "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Once a plaintiff has established a prima facie case, a presumption of discrimination arises, *Farias,* 259 F.3d at 98, and the burden shifts to the defendant, who must then show that "a legitimate, nondiscriminatory reason" exists for the alleged adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Farias,* 259 F.3d at 98. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not unlawful, since the burden of persuasion remains with the plaintiff throughout the case; the defendant must simply articulate the existence of a nondiscriminatory reason. *See Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–58, 101 S.Ct. 1089, 1094–96, 67 L.Ed.2d 207 (1981); *Farias,* 259 F.3d at 98. This articulation must be clear and specific. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1226 (2d Cir. 1994); *Meiri,* 759 F.2d at 997.

If the defendant presents legitimate reasons for its actions, which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination, the presumption drops out of the analysis. *See Farias,* 259 F.3d at 98; *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). The plaintiff must then carry the ultimate burden of persuasion as to the fact of intentional discrimination, i.e., that race or another protected status was a determinative factor motivating the employer's conduct. *See Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Farias,* 259 F.3d at 98–99. To do so, the plaintiff must establish that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

To establish pretext, "the plaintiff must produce not simply 'some' evidence, but 'sufficient' evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendants were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock,* 224 F.3d at 42 (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996)). While a plaintiff cannot carry his burden by showing pretext alone, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749; *see also Reeves,* 530 U.S. at 148, 120 S.Ct. at 2109; *Farias,* 259 F.3d at 98; *Chambers,* 43 F.3d at 38.

## B. Plaintiff's Prima Facie Case

There is no dispute that Plaintiff has satisfied the first and second elements of a prima facie case of discrimination. Defendants do not dispute that as a black person of Jamaican ancestry, Plaintiff qualifies as a member of a protected class. As for the second element, whether Plaintiff satisfactorily performed the duties required by his position, Defendants concede that Staff consistently received reviews of "proficient" or "above average" for his work.

*See* Defendant's Memorandum of Law ("Def.'s Mem.") at 3. Furthermore, Defendants contend that Staff was transferred to Manufacturing Engineering because he would be a "valuable asset" there, *id.*, and that he was dismissed because of a reduction in the workforce, rather than because of any deficiencies in his performance. Hence, the second element of Staff's prima facie case has been satisfied.

There are substantial disputes, however, about whether Plaintiff has satisfied the third and fourth elements of a prima facie case with respect to many of his claims.

The third element of a prima facie case of discrimination requires a showing that the plaintiff suffered an adverse employment action. As the Second Circuit has noted:

> A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000); *see also Weeks v. New York State Div. of Parole,* 273 F.3d 76, 85 (2d Cir.2001).

As discussed, the fourth element requires a plaintiff to come forward with some evidence to demonstrate that the adverse action occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in a protected class.

1. Plaintiff's Claims

■ Plaintiff alleges that in 1996, after he became a Project Manager, Defendants failed to provide him with an office or with employees to supervise, and that in 1996, the 20 NM project was transferred from his supervision to Terbancea's.

These acts, even if true, simply do not rise to the level of being actionable adverse employment actions. While these acts may not have been to Plaintiff's liking, or may have reduced his overall job satisfaction, the standard for an adverse employment action requires more.

There is nothing in the record, save Plaintiff's own views, indicating that any of these perceived slights materially altered or adversely affected Plaintiff's working conditions. Specifically, the transfer of a project on which Plaintiff had been working to another employee, without more, is not an adverse employment action. *See Galabya,* 202 F.3d at 640 ("To be materially adverse a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'") (internal citations omitted); *Weeks,* 273 F.3d at 86–87 (transfer of work insufficient to give rise to adverse employment action); *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1556–57 (D.C.Cir. 1997) ("changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes").[3]

---

**3.** Nor has Plaintiff adduced any evidence suggesting that the reassignment of some of his work to another employee was the result of racial discrimination. For example, there is no evidence indicating that Staff alone, or only black employees, had some of their work reassigned to other employees. Plaintiff's supervisor, Salinaro, transferred the project in order to allow Staff to focus his attention on PVM-related tasks. *See* Salinaro Dep., Def.'s Ex. F at 427.

█ Plaintiff also alleges that when he was promoted to the position of Project Manager, he did not receive an office or subordinates to supervise. In essence, Plaintiff complains that although he was given a more prestigious title, was awarded an increased salary, and was given increased responsibility, he did not receive all of the amenities he had hoped for in connection with his promotion. Plaintiff does not contend that his working conditions changed for the worse with respect to his promotion. Nor is there any evidence that Plaintiff was unable to fulfill his responsibilities as a Project Manager because he lacked an office or subordinates. Indeed, his performance evaluation in 1997, after he became a Project Manager, was actually better than his 1996 evaluation. *See* Pl.'s Ex. A. Under these circumstances, Defendants' failure to provide Plaintiff with a private office or subordinates does not, as a matter of law, constitute an adverse employment action. *Cf. Wanamaker*, 108 F.3d at 466 (loss of phone and office while terminated employee served out remaining work days, does not constitute an adverse employment action); *Banks v. Metro–North Commuter R.R.*, No. 97 Civ. 1601(NRB), 2000 WL 45435, at *7 (S.D.N.Y. Jan. 19, 2000) (granting summary judgment on claim that defendant denied plaintiff a beeper, an adequate office, and office furniture); *but see Collins v. State of Illinois*, 830 F.2d 692, 703–04 (7th Cir.1987) (loss of phone and office, accompanied by loss of status, clouding of job responsibilities, and diminution of authority, contributed to adverse employment action).[4]

In sum, Plaintiff has failed to establish that these acts or conditions—the failure to provide Plaintiff with an office or subordinates, and the transfer of one of his projects to another employee—were adverse employment actions. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of disparate treatment with respect to these acts.

\* \* \* \* \* \*

█ Plaintiff also claims that he was wrongfully transferred from the R & D Department to the Manufacturing Engineering Department in 1998, and that the transfer was motivated by racial and national origin discrimination.

█ "[A] purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Galabya*, 202 F.3d at 640 (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). "[T]he mere fact that an employee has been transferred or that his job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions." *Cooper v. New York State Dep't of Human Rights*, 986 F.Supp. 825, 828 (S.D.N.Y.1997) (citing *de la Cruz v. New York City Human Resources Admin. Dep't of Social Services*, 82 F.3d 16, 21 (2d Cir.1996)); *see also Rodriguez v. Bd. of Educ. of Eastchester*, 620 F.2d 362, 365–66 (2d Cir.1980); *Adeniji v. Admin. for Children Servs.*, 43 F.Supp.2d 407, 426 (S.D.N.Y.), *aff'd*, 201 F.3d 430 (2d Cir. 1999). However, where that transfer carries with it serious negative consequences to the plaintiff's conditions of employment, or has some other "attendant negative result," a transfer may qualify as an adverse

---

4. The Court further notes that Plaintiff has not satisfied the fourth element of a prima facie case of discrimination with respect to these claims. For example, other than his conclusory assertion, there is no competent evidence in the record identifying other project managers of different races who had offices and subordinates. Moreover, Plaintiff has failed to point to any evidence in the record that would permit a jury to conclude that race played any role in the transfer of one of his projects to another employee.

employment action. *Patrolmen's Benevolent Ass'n v. City of New York,* 74 F.Supp.2d 321, 334–35 (S.D.N.Y.1999) (quoting *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 377 (S.D.N.Y.1999)); *see also de la Cruz,* 82 F.3d at 21 (court concludes that allegation of a transfer from an elite unit to a less prestigious unit with little opportunity for professional growth, was barely sufficient to satisfy third prong of prima facie case); *Boyd v. Presbyterian Hosp.,* 160 F.Supp.2d 522, 531 (S.D.N.Y.2001)("a transfer can, when representing a significant change in the nature of one's work," adversely affect one's status within the meaning of Title VII).

Plaintiff's transfer was part of a management decision in 1998 to shift the work of R & D, reducing its involvement in semi-works operations so that it could focus on new product development. As part of this reorganization of responsibilities, Staff was offered a transfer to the Manufacturing Engineering Department, which would be assuming responsibility for PVM technology and production. *See* Zanetti Dep., Def.'s Ex. I at 60–69. According to Defendants, Staff was chosen for the transfer because of his expertise in the PVM area, and because the new job required the participation of an individual who would not need supervision from R & D. *See id.* at 60–61.

Staff did not suffer a decrease in salary or fringe benefits as a result of the transfer.[5] Staff concedes that his duties remained largely unchanged, and that after the transfer he "continued to oversee PVM production, and performed other duties with respect to PVM membranes, as well." Staff Aff. ¶ 33. Moreover, his transfer was but one part of a broad company reorganization which involved shifting tasks between different departments, and with that shift in tasks, a shift in the placement of certain employees. Indeed, Staff was not the only employee transferred from R & D; for example, Duthie, his supervisor in Manufacturing Engineering, was also transferred from R & D to Manufacturing Engineering.

Nevertheless, Staff alleges the existence of a variety of intangibles that lead him to conclude that his transfer was an adverse employment action. For example, Staff claims that he had been promised that he would retain his title of Project Manager after being transferred to Manufacturing Engineering, but was thereafter given the title of Mechanical Engineer. According to Staff, the resulting change in title was tantamount to a demotion and had detrimental effects on his career. He fails, however, to offer any evidence, other than his own conclusory opinion, to support this contention. The record indicates that the R & D and Manufacturing Engineering Departments were simply organized differently, and that the titles were distinct in name only, not in substance. *See* Zanetti Dep., Pl.'s Ex. I at 137. Indeed, the two people with whom he repeatedly compares himself with respect to his disparate treatment claims, Bilich and Terbancea, although both chemists, received promotions and transfers that left them with engineering titles. *See* Pl.'s Mem. at 8–9.

Staff also claims that he was forced to accept the transfer because of the threat of losing his job at Pall. *See* Pl.'s Mem. at 10–11. Even if Plaintiff had little choice in accepting the transfer, this does not demonstrate or even suggest that the transfer was tantamount to a demotion.

---

5. Plaintiff's contention that he was denied the use of an office because of the transfer is belied by his prior claims; he never had an office as Project Manager in R & D. (Staff Aff.

¶ 6.) Moreover, Duthie, who was Plaintiff's supervisor, was not given an office when he was transferred to Manufacturing Engineering. *See* Zanetti Dep., Pl.'s Ex. I at 134–35.

Plaintiff's claim that the transfer was effectively a demotion appears to hinge on the fact that he went from a chemistry-oriented R & D Department to an engineering department, which, he implies, did not make adequate use of his background in chemistry. Yet, the project which was Staff's primary responsibility in R & D, remained his responsibility after the transfer. Staff was chosen for the transfer in large part because Zanetti viewed him as a good fit to supervise the PVM semi-works operation, in light of his expertise and the fact that he had been working on the PVM Project since 1994. *See* Zanetti Dep., Pl.'s Ex. I at 90. Indeed, Plaintiff contends that no one was more qualified on PVM than he. *See* Staff Aff. ¶ 29. Thus, he does not argue that the work he was doing on PVM, although it was transferred to the Manufacturing Engineering Department, was inappropriate for his background.

Plaintiff has failed to produce any evidence demonstrating that his position after the transfer was materially less prestigious, less suited to his skills, or materially less conducive to career advancement. *See Galabya*, 202 F.3d at 641–42; *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 265 (E.D.N.Y.1999) ("Despite Ticali's disdain for the pre-kindergarten position, she has provided no material evidence that her transfer obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way."); *cf. Rodriguez*, 620 F.2d at 366 (finding adverse employment action where art teacher was transferred to position that was "profoundly different" from previous position so as to render useless twenty years of experience and doctoral degree in art education). There is nothing in the record to indicate that he suffered any material detriment as a result of the transfer. Because Plaintiff has failed to point to any evidence, save his own unsupported,

conclusory statements, demonstrating that his new position was any less prestigious than his previous one, or that his duties were significantly altered, there is no basis to conclude that his transfer to Manufacturing Engineering, a lateral transfer without a loss in salary or benefits, was an adverse employment action.

Finally, although unnecessary to decide this claim, the Court notes that even if Plaintiff could demonstrate adverse employment consequences with respect to his transfer, he has not satisfied the fourth prong of a prima facie case of discrimination. There is not a shred of evidence in the record which suggests that Plaintiff's transfer was in any way related to his race or national origin, or that Defendant's explanation for the transfer—a restructuring and change in focus of the R & D Department—was a pretext for racial discrimination. The project on which Plaintiff had been working, along with others, was transferred to Manufacturing Engineering. He had an expertise in the project, which was regarded as being of value to Manufacturing Engineering. *See* Pl.'s Ex. I at 90–91. Indeed, even Plaintiff contends that he, of all Pall employees, had the most expertise in the area of PVM semi-works operations. *See* Staff Aff. ¶ 29. Finally, Plaintiff was not the only employee transferred from R & D to Manufacturing Engineering—Duthie, a white male, was also transferred from R & D to Manufacturing Engineering at the same time, for essentially the same reasons, as were Vladimir Bhulk and Olga Miklashewsky. *See* Zanetti Dep., Def.'s Ex. I at 76–77. Plaintiff has not offered any evidence suggesting that Defendants' explanation for his transfer was false, no less a pretext for racial discrimination.

In sum, Plaintiff has failed to establish a prima facie case of discrimination with respect to his transfer to the Manufacturing

Engineering Department, and has failed to offer any competent evidence that would suggest that Defendants' reason for the transfer was false or a pretext for racial discrimination. Accordingly, the Court recommends that Defendants' motion for summary judgment be granted with respect to this claim.

\* \* \* \* \* \*

Plaintiff claims that when he was promoted to the position of Project Manager, in 1996, he did not receive an appropriate raise in salary. He points to this as evidence of a pattern of discrimination with respect to his salary and promotion history in general.

Disparate treatment with respect to one's salary would clearly constitute an adverse employment action. The real issue with respect to this claim is the fourth and final element of the prima facie case—whether the employment action in question gives rise to an inference of racial discrimination. A plaintiff may support an inference of discrimination by demonstrating that similarly situated employees of a different race or national origin were treated more favorably. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997). In order to make such a showing, Plaintiff must compare himself to employees who are "similarly situated in all material respects." *Norville*, 196 F.3d at 95 (quoting *Shumway*, 118 F.3d at 64).

Staff was promoted to Project Manager in 1996. His promotion came after he had worked at Pall for thirteen years, and had received one previous promotion. Upon being promoted, his weekly salary was raised from $867 to $954, an increase of roughly ten percent. Staff alleges that, in comparison to other similarly situated Pall employees, the salary he received was comparatively low.[6] Specifically, he compares his treatment to two allegedly similarly situated white employees, Moira Bilich and Daniela Terbancea. Plaintiff maintains that Bilich and Terbancea both rose through the ranks much more quickly than he did. Bilich was made a Project Manager in 1995, after four years of employment with Pall, and Terbancea, although never a Project Manager, went through a series of promotions, culminating in her position as Quality Engineer, in 1997.

Plaintiff then points to his salary treatment as compared to Bilich and Terbancea, and claims that he received smaller and less frequent salary increases. According to Plaintiff, Bilich received a series of promotions in a period of five years, and was paid $940 per week upon her promotion to Project Manager. She then received further raises in 1998, 1999, and 2000, eventually bringing her salary to $1236 per week. Terbancea received a number of raises from 1991 to 1997, eventually reaching a weekly salary of $712. In April 1998, Terbancea left Pall, and was rehired eighteen months later as a Quality Engineer, at a salary of $1029 per week.

As an initial matter, Plaintiff's claim is premised on certain fundamental misconceptions. Plaintiff seeks to have the Court compare his entire 17–year career history at Pall with two white, female employees, neither of whom began working at Pall at the same time as Plaintiff or had exactly the same positions or responsibilities as Plaintiff. Moreover, he selectively focuses on certain years in their work at Pall, choosing to ignore their complete employment histories. Plaintiff claims

---

**6.** As discussed, although Plaintiff also claims that he should have been promoted earlier in his career, this claim is time-barred.

discrimination with respect to promotions, although he points to no promotional positions for which he applied and was turned down. Further, he simply dismisses any differences between his performance evaluations and those of Bilich and Terbancea, with his personal assessment that his "performance was just as good if not better than anyone else in the R & D department." Pall Aff. ¶ 28. Finally, the thrust of Plaintiff's claim is that it took him much longer to be promoted to Project Manager and to receive the salary of a Project Manager than it did for Bilich and Terbancea. For example, he argues that "Ms. Bilich received three promotions in the space of four years (more than Mr. Staff in his entire 16–17 years), and salary increases so that in 5 years she was making about the same amount that it took Mr. Staff 13 years to reach." Pl.'s Mem. at 8. And as to Terbancea he argues, "in a space of about 8 years, Ms. Terbancea received three promotions, and her salary was just slightly less than Staff's salary; it took Mr. Staff about 16 years to reach this salary, and in the course of such time he received only two promotions." Pl.'s Mem. at 9. Thus, the thrust of Plaintiff's promotion and salary claim is not what happened to him after he was made a Project Manager in 1996, but what he failed to achieve in the previous thirteen years. As discussed earlier, any such claims are time-barred. Nevertheless, we turn to the specifics of Plaintiff's claim.

■ The comparison with Terbancea is unhelpful to Plaintiff's case. If a comparison with another employee is to lead to an inference of discrimination, it is necessary that the employee be "similarly situated in all material respects" *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir.2001) (quoting *Shumway*, 118 F.3d at 64) (internal quotations omitted). "[C]ircumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Id.* (citing *Graham v.*

*Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000)); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–54 (2d Cir.2001). Though Terbancea, like Staff, began working at Pall as a chemist, and briefly worked under his supervision, she followed a different path at Pall, working as a Process Development Engineer and later as a Quality Engineer. *See* Terbancea Dep., Pl.'s Ex. K at 30–31, 40–41. Staff himself claims to have had no interest in being an engineer. Perhaps for this reason, when the position of Quality Engineer became available, rather than applying for the position himself, Staff actually notified Terbancea of its availability. *See* Terbancea Dep., Def.'s Ex. BB at 42. For these reasons, Terbancea cannot be said to be similarly situated for the purpose of disparate treatment analysis.

Moreover, when Plaintiff was made a Project Manager in 1996, his salary rose to $954 per week. At that point, Staff's salary was more than $200 per week greater than Terbancea's. Indeed, Plaintiff claims that he never received raises greater than 3% to 7%, except on two occasions, when he received raises of 15.1% and 10.03%, respectively. *See* Pl.'s Mem. at 7. Yet, by Plaintiff's own admission, Terbancea's raises were largely in that range. It was only after she left Pall and was rehired in a new position, that she received a 38.87% increase over the salary she had been earning when she had last been at Pall. Indeed, even at that point, she was still earning less than Plaintiff. *See* Pl.'s Mem. at 9. There is simply no evidence suggesting that there was disparate treatment in the salaries of Staff and Terbancea.

■ Bilich, upon her promotion to Project Manager, was actually paid *less* than Plaintiff. Indeed, her salary was at the low end of the scale for Project Managers. *See* Def.'s Ex. U. This belies Plaintiff's contention that he received a disparately

low raise when he was promoted to the position of Project Manager. While the percentage increase Bilich received may have been higher than the increase received by Staff when he was promoted to Project Manager, Bilich was being promoted from a different position than that which Staff held; the salary range for her old position was lower than the salary range for Project Manager, and thus the percentage increase merely reflected the necessary adjustment to bring her within the Project Manager payscale. Although, in 1998, Bilich received a 17% increase in salary, as discussed below, she was the only employee who received an above-guideline raise because of her excellent performance evaluations.

Plaintiff appears to contend that a comparison with one co-employee suffices to create an inference that any difference in pay was a result of discrimination. The Court finds this proposition dubious, particularly where at least six other employees, five of whom are white, and the other Asian, received comparable pay increases to that of Plaintiff during the time period in question, 1997–98.[7] This fact casts considerable doubt upon Plaintiff's contention that he was singled out for unfavorable treatment because of his race and national origin.[8] Moreover, in 1998, when Bilich received a higher raise than Plaintiff, they were not similarly situated because Bilich had received an excellent performance review, while Plaintiff's job performance was found to be "proficient."

■ Nonetheless, to establish a prima facie case, it is generally enough to show that a similarly situated employee who is not part of a protected group received better treatment. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *McGuinness,* 263 F.3d at 53; *Fisher v. Vassar College,* 114 F.3d 1332, 1337 (2d Cir.1997) (en banc). Though the difference between Bilich's and Staff's pay was not dramatic, and their performance evaluations were not comparable, the burden of demonstrating a prima facie case of discrimination is not substantial. Although it is doubtful, the Court will nevertheless assume that Plaintiff has established a prima facie case of discrimination with respect to his salary.

Defendants have proffered a non-discriminatory reason for Plaintiff's salary level and the distinction between his salary and Bilich's. Defendants argue that all employees received raises according to corporate guidelines. Each year, the Human Resources Department received a directive from the President and Chief Executive Officer outlining a corporate "guideline" for employee raises. *See* Lowy Dep., Def.'s Ex. G at 105–10. The Human Resources Department then communicated that guideline to supervisors by distributing a "salary review sheet" with performance reviews, which instructed supervisors to recommend salary increases in accordance with Pall's expectation that "most employees" would receive the guideline increase, though "excellent" performers could, budget permitting, qualify for a higher raise. *See* Def.'s Ex. L. All employees received annual performance reviews which were used to determine salary increases.

---

**7.** Other employees who received pay increases, which comported with corporate guidelines, as did Plaintiff's, included Sue Cho (Asian), Joseph Gregg (white), Isaac Rothman (white), Victor Tslayuk (white), John Moccia (white), and John Gerringer (white). *See* Def.'s Exs. O and Q.

**8.** The Court notes that a direct comparison with these employees may suffer from the same problems as the comparison with Terbancea, since these employees followed somewhat different career progressions than Plaintiff within the R & D program.

In 1997 and 1998, Staff received primarily "proficient" ratings. Staff thus received the corporate guideline raise, as was expected for most employees. Other employees who received even better reviews from Salinaro also received the guideline increase.[9] In contrast, Salinaro recommended that Bilich receive higher than guideline increases because her work was consistently "outstanding". *See* Def.'s Ex. M (Bilich Performance Appraisal Reviews). The operation of a system that rewards "proficient" performance with an average increase in salary, while rewarding "outstanding" work with a more significant increase, qualifies as a legitimate non-discriminatory reason sufficient to carry Defendants' burden at this stage.

Plaintiff has not pointed to a scintilla of evidence indicating that Defendants' explanation for giving Plaintiff a guideline pay increase, and for awarding a somewhat higher increase to Bilich, is a pretext for discrimination. Plaintiff has ignored Pall's salary policy, which was applicable to all employees. Plaintiff received salary increases consistent with that policy. Moreover, during the same period, six other employees, most of them white, received increases comparable to Staff's, which comported with the corporate guidelines. Bilich, the one employee who received a higher pay increase, had received excellent performance reviews. Plaintiff does not even attempt to compare his performance reviews to Bilich's, instead relying entirely on his own assessment that his job performance was "just as good if not better than Bilich." Staff Aff. ¶ 7. Plaintiff's personal view of his and Bilich's job performance is irrelevant. Nor is it this Court's role to substitute its judgment for that of an employer with respect to an assessment of the quality of an employee's work. *Cf. Meiri,* 759 F.2d at 995 ("In determining

whether an employee's job performance is satisfactory, court's may—as they often must—rely on the evaluations rendered by supervisors ... The ultimate inquiry is whether an employee's performance meets his employer's legitimate expectations.")(internal quotations omitted); *Thornley v. Penton Publishing, Inc.,* 104 F.3d 26, 29 (2d Cir.1997)("Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge.").

There is simply no competent evidence in the record from which a jury could reasonably infer that the reason Bilich received excellent performance reviews, and thus a higher than average raise in salary, was because she was white, and that the reason that Staff received salary raises consistent with corporate guidelines was because he was black. Accordingly, the Court recommends that Defendants' motion for summary judgment be granted with respect to Plaintiff's salary and promotion claim.

## IV. Retaliation

Plaintiff claims that his allegedly negative performance appraisal, in 1998, as well as his termination in 1999, were in retaliation for his having filed a complaint with the EEOC.

### A. Legal Standards

To establish a prima facie case of retaliation, a plaintiff must show: (1) that he was engaged in a protected activity under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) a causal connection between the

**9.** For example, both Sue Cho and Isaac Rothman received "above average" and "outstanding" ratings, yet both received guideline increases. *See* Def.'s Ex. O.

adverse action and the protected activity. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 79 (2d Cir.2001); *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001); *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998).

A plaintiff may prove that retaliation was a "substantial" or "motivating" factor behind an adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). "The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir.2001) (citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980)).

Once a plaintiff has established a prima facie case of retaliation, a presumption of unlawful retaliation arises, and the burden shifts to the defendant, as in a disparate treatment case. *See, e.g., Holtz*, 258 F.3d at 81; *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 443 (2d Cir. 1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir.1998). The defendant has the burden of pointing to evidence demonstrating a legitimate, nonreta-liatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient evidence for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. *See Holtz*, 258 F.3d at 81; *Richardson*, 180 F.3d at 443, *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998).

### B. *The 1998 Appraisal*

 Defendants concede that Plaintiff has established the first two elements of his prima facie case; first, that his filing of a charge of discrimination with the EEOC in November 1998 constituted protected activity, and second, that his supervisors learned of the complaint before issuing his evaluation. The Court therefore turns to an assessment of the third prong of the prima facie case. If no adverse employment consequence to Plaintiff has been demonstrated, Plaintiff cannot establish a prima facie case of retaliation.

As an initial matter, other than Plaintiff's personal views, there is no basis to conclude that his December 1998 review was negative. Pall's performance evaluations provide ratings on a scale of one to five, with a one for outstanding, two for above average, three for proficient, four for adequate, and five for unsatisfactory. Staff received a rating of proficient for all but one rated criterion, including quality of work, quantity of work, planning and organization, communication, adaptability, and dependability. A proficient rating is considered to be "good, solid performance."[10]

---

**10.** According to the Performance Appraisal Review's self-described ratings, a score of "proficient" (3) is described as follows:

The majority of employees will earn this classification. A rating of proficient should be assigned to those whose demonstrated results clearly meet all the requirements of the position in terms of quality and quantity of output. It is good, solid performance, normally expected of those who have the necessary education, training and relevant experience to enable them to effectively perform in a consistently reliable and professional manner. Although minor deviations may occasionally occur, the overall level of achievement meets or slightly exceeds major job requirements.

(Def.'s Ex. R at D00169.)

For the remaining category, job knowledge/skills, he received a two, for "above average."[11] Furthermore, while the "Supervisor's Comments" section of the evaluation states that Staff "needs to report and disseminate information on a timely basis," all other comments are positive. *See* Def.'s Ex. R. For example, the comments state that Staff's "knowledge has been a valuable asset to the casting engineering department .... He is technically proficient in his duties." It lists four impressive accomplishments Staff made over the past year. *Id.* In sum, no reasonable trier of fact could conclude that Staff's 1998 appraisal was negative.

Even if the appraisal could be viewed as negative, since there is no evidence demonstrating that it had unfavorable attendant consequences, it cannot be considered an adverse employment action. *See Weeks*, 273 F.3d at 86 (nature of discipline or counseling memo not adverse employment action, in absence of serious ramifications; "It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 284 (S.D.N.Y.1999) (negative evaluations alone, without accompanying adverse result, not cognizable); *Simmons v. New York City Health and Hospital Corp., et al.*, 2001 WL 483675, at *5 (E.D.N.Y. Mar. 30, 2001) (same); *Pellei v. Int'l Planned Parenthood Fed'n, Inc.*, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999) (no prima facie case where plaintiff "fails to show that his poor performance reviews caused a materially adverse change in the conditions of his employment" and "does not

point to any negative consequences flowing from his poor reviews, such as demotion, suspension, loss of wages or any action which marked him as a less capable analyst"); *Gallo v. Herman*, 1999 WL 249709, at *2 (S.D.N.Y. Apr. 28, 1999) (plaintiff has failed to adduce any evidence indicating that receipt of "still-high but not-quite-as-high-as-previous rating caused any material impact on term or condition of [her] employment"); *Castro v. New York City Bd. of Educ.*, 1998 WL 108004, at *5 (S.D.N.Y. Mar. 12, 1998) (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions").

Plaintiff has failed to point to any negative consequences associated with his 1998 performance review. Although he claims that his termination was linked to this review, this is inconsistent with his claim that he was terminated in retaliation for his filing an EEOC charge. In fact, Plaintiff lost his job more than six months after the review was issued, and he has failed to point to any evidence, other than his speculation, suggesting that his largely favorable review was a factor in his later termination. As discussed below, he and other employees in his department lost their jobs because of a consolidation of functions at Pall.

Finally, Plaintiff has failed to produce any evidence demonstrating that his performance review was inaccurate, or that it was motivated by retaliation. "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *see*

---

**11.** A score of "above average" is described as follows:

> This is a rating that best describes a level of accomplishments that goes well beyond expected results on nearly all performance factors, especially in the critical areas of major responsibilities. The individual consistently demonstrates truly exceptional achievements in terms of quality and quantity of output.
> (*Id.*)

*also Meiri,* 759 F.2d at 998 (conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)).

In sum, Plaintiff has failed to adduce any competent evidence demonstrating that his 1998 performance review was a materially adverse employment action, or that it was issued in retaliation for his filing his EEOC complaint. He has thus failed to establish a prima facie case of unlawful retaliation. Accordingly, the Court recommends that Defendants' motion for summary judgment be granted with respect to this claim.

### C. Plaintiff's Termination

#### 1. Prima Facie Case

■ With respect to Plaintiff's termination claim, Defendants again concede that Plaintiff has established the first two prongs of a prima facie case of retaliation. It is also beyond dispute that termination of employment qualifies as an adverse employment action, satisfying the third prong. Therefore, whether Plaintiff has established a prima facie case with respect to his termination claim turns on whether he has satisfied the fourth element, which in this case requires the demonstration of a causal connection between Staff's filing a complaint with the EEOC and Pall's decision to terminate his employment.

In the instant case, Plaintiff filed a complaint of discrimination and harassment with the EEOC on November 28, 1998, and he was terminated on October 7, 1999, more than ten months later. This is substantially longer than the periods that most courts have deemed sufficient to create an inference of retaliation. For example, in *Cifra v. G.E. Co.,* 252 F.3d 205, 217 (2d Cir.2001), the Second Circuit held that the causation element of the plaintiff's prima facie case had been established upon the plaintiff's showing that she had been fired 20 days after she had hired an attor-

ney to pursue a claim of gender discrimination. Similarly, in *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996), the requisite connection "was shown ... by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days." In *Quinn,* 159 F.3d at 769, the Second Circuit held that it was error to grant summary judgment dismissing the plaintiff's retaliation claim for lack of evidence of a causal connection, where her "discharge came less than two months after she filed a complaint with defendant's management and just ten days after she filed a complaint with the state division of human rights." (internal citations omitted). Nevertheless, the burden at the prima facie stage is not an onerous one, and on at least one occasion, the Second Circuit has held that a roughly similar period of time as at issue in this case created an inference of retaliation. *See Raniola,* 243 F.3d at 624 (nine months between protected activity and termination created inference of causal connection for purposes of prima facie case). While it is a close case, the Court finds that Plaintiff has satisfied his minimal burden in establishing a prima facie case of unlawful retaliation with respect to the loss of his job.

#### 2. Defendants' Explanation

■ Defendants contend that Staff was dismissed as part of a corporate and departmental reorganization, which resulted in a number of other layoffs at Pall. *See* Lowy Dep., Def.'s Ex. G at 58. In September 1999, the Manufacturing Engineering Department was required to reduce costs. As a result, managers at Pall decided that some quality and engineering functions should be consolidated, in order to eliminate task duplication. *See* Pall Engineering Department Restructuring Rationale (Def.'s Ex. S). The responsibility for deciding which employees would be affect-

ed by the reorganization was left to Buzzeo, the new Manager of Quality and Engineering, who had not worked with Staff personally. After assessing various employees' responsibilities, Buzzeo identified four positions that could be restructured. *See* Buzzeo Aff., Def.'s Ex. E at ¶¶ 5–9. Four positions, including Plaintiff's, were eliminated, and three employees, including Staff, were discharged, while a fourth employee was transferred. One employee who was discharged was white and had been working at Pall for 10 years, and the other was Asian and had been at Pall for 20 years. *Id.*[12]

In considering which positions to consolidate, Buzzeo determined that Duthie and Staff's duties could be combined into a single position. He also determined that both employees had the PVM semi-works knowledge to fill the position, and that one would have to be chosen over the other. After investigating both employees' experience and past performance, Buzzeo concluded that Duthie was the more qualified candidate, in part because he concluded that Staff had been inattentive to certain project schedules and did not demonstrate sufficient urgency in his approach to certain projects. *See* Buzzeo Aff., Def.'s Ex. E at ¶¶ 5–6. As a result, Buzzeo recommended that Duthie assume Staff's responsibilities, and that Staff's position be eliminated. If believed, Defendants' explanation is a legitimate, non-retaliatory reason for Plaintiff's termination.

### 3. Pretext

Plaintiff has been unable to point to any direct evidence indicating a discriminatory or retaliatory motive in Pall's decision to terminate his employment. Rather, he argues that circumstantial evidence leads to

the conclusion that his discharge was prompted by a retaliatory motive.

Plaintiff claims that he was terminated, while Terbancea, who had not filed any complaints against Pall, was, in the long run, retained. *See* Pl.'s Mem. at 11–12. On this theory, so long as any employee in the company did not complain of discrimination and did not lose her job, there would be an inference of retaliation. Such a result would be absurd. There is simply no correlation between Plaintiff's and Terbancea's situations. The record supports Defendants' contention that Trebancea was re-hired by Pall as an engineer, prior to the time of the reorganization and Staff's termination. Indeed, Staff never applied for the position for which Terbancea was rehired, and he actually notified Terbancea of the position's availability. *See* Def.'s Ex. BB at 42. Moreover, Terbancea did not work in the same department as Staff, or under the same supervisor. Nor was her position identified as being duplicative of any other during Pall's restructuring. In short, nothing about her retention suggests any retaliatory motive with respect to the decision to discharge Plaintiff.

Plaintiff also claims that Duthie, Staff's supervisor at the time of the termination, falsely testified at his deposition that he was not involved in filling out Staff's retention review form, when he had in fact completed the form and recommended Staff's termination. *See* Pl.'s Mem. at 15. However, Plaintiff has failed to point to anything in the record indicating that Duthie lied at his deposition. Indeed, no portion of Duthie's deposition testimony has even been submitted in evidence, by either Plaintiff or Defendant. The evidence that is in the record indicates that although

---

12. Vladimir Bukh, a Caucasion electrical engineer with ten years of service to Pall, was transferred to a vacant electrical engineering position in Maintenance. Plaintiff does not contend that he was qualified for, or even wanted, this position.

Duthie was in fact asked to fill out a retention review form for Staff, it was Buzzeo, not Duthie, who had the final say in deciding which employee to terminate, Duthie or Staff. *See* Buzzeo Aff., Def.'s Ex. E at ¶¶ 4–6. Furthermore, although Duthie recommended Staff's termination, there is nothing to suggest that he did so in response to Staff's EEOC complaint. Plaintiff did not charge Duthie with discrimination in that complaint. Rather, he complained about his transfer from R & D to Manufacturing Engineering—a decision made by Zanetti. Indeed, Duthie was actually transferred with Plaintiff from R & D to Manufacturing Engineering. Thus, there is no suggestion that Duthie had a motive to retaliate against Staff. If any motive can be inferred, it is Duthie's desire to preserve his own job. Even if that were the case, it provides no support for Plaintiff's claim of retaliation. Finally, Buzzeo, the decision-maker, was not even aware of Plaintiff's EEOC complaint at the time he recommended Staff's termination. *Id.* ¶ 7.[13]

Other than the fact that Plaintiff lost his job ten months after he filed his EEOC complaint, he points to no evidence that would suggest that his termination was a result of impermissible retaliation. Plaintiff lost his job in the context of a corporate restructuring, in which two other long-term employees in his department, one white and one Asian, also lost their jobs.

In short, there is nothing in the record that would permit a reasonable finder of fact to conclude that Plaintiff's termination occurred in retaliation for his complaint to the EEOC. Accordingly, I recommend that summary judgment be granted as to Plaintiff's termination claim.

## V. Plaintiff's Hostile Work Environment Claim

In addition to the concrete adverse employment actions alleged above, Staff maintains that several actions allegedly taken against him created a hostile work environment which was attributable to his race and national origin.

A hostile work environment claim provides redress for employees who suffer harm from discrimination that cannot easily be quantified. As the Supreme Court explained in *Morgan*, "[w]e have repeatedly made clear that although Title VII mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to 'economic' or 'tangible' discrimination." 153 U.S. at ——, 122 S.Ct. at 2073 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). In statutes prohibiting workplace discrimination, "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment ... in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Id.* (internal quotations omitted).

In order to establish a hostile work environment, the victim must demonstrate a "workplace ... permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment..." *Id.* (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. at 370); *see also Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). In order to be actionable, a racially objectionable environment must be both objectively and subjectively offensive, "one that a reasonable person would find

---

**13.** Buzzeo was not even named as a defendant in this action.

hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan,* 536 U.S. at ——, 122 S.Ct. at 2073. "As a general rule, incidents must be more than episodic, they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano,* 294 F.3d at 374 (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). Finally, in order to establish a race-based hostile work environment, a plaintiff must demonstrate that the conduct occurred because of his race. *See Richardson,* 180 F.3d at 440; *cf. Alfano,* 294 F.3d at 374.

Plaintiff does not claim that he suffered any overtly hostile conduct, such as racial slurs, seriously derogatory remarks, or racially harassing behavior. Rather, Plaintiff bases his hostile work environment claim on a number of race-neutral actions, which he claims rendered his work environment abusive. Plaintiff argues that his work environment became abusive when two different supervisors, in events separated by approximately three years, took certain actions. Plaintiff first complains about "when Salinaro refused to give Mr. Staff the benefits of employment to which he was entitled, such as personnel to work on his projects (like every other Project Manager had) and an office, but also lied to him about upcoming projects, in an effort to force Mr. Staff out of the R & D

Department to the Manufacturing Engineering department." Pl's. Mem. at 13. He next places in issue his complaint about his 1999 performance review, which was "met with harassment from Duthie." *Id.* This alleged harassment consisted of Duthie claiming that Plaintiff was being insubordinate.

The first set of acts of alleged harassment have already been addressed in relation to Plaintiff's claim that he was subjected to racially discriminatory disparate treatment. As discussed, Plaintiff cannot even establish a prima facie case of discrimination with respect to these claims because, *inter alia,* there is no evidence that these actions were in any way the result of race-based animus. Nor is Plaintiff able to establish that these acts were even adverse employment actions. For example, Plaintiff was promoted to the position of Project Manager in 1996. That he did not receive employees to supervise upon his promotion can hardly be viewed as a racially abusive act, particularly where there is no evidence that Plaintiff's work required the assistance of subordinates. Further, even if Salinaro lied to Plaintiff in 1998 about the future work he anticipated in the R & D Department, there is no objective basis to view this act as contributing to a racially abusive work environment.[14]

 Plaintiff's second claim with respect to a hostile work environment is that when he complained to Duthie in March 1999 about his "negative" performance appraisal, Duthie harassed him by accusing him of insubordination.

On February 23, 1999 Staff sent Duthie an e-mail, complaining about his performance review. This led to an exchange of

---

**14.** Indeed, Plaintiff's claim that he was lied to in order to induce him to leave the R & D Department is belied by his contention, which the Court has accepted as true, that he was given no choice about transferring to the Manufacturing Engineering Department.

e-mails. Staff claimed that the appraisal was "indisputably false and unfair," and advised Duthie that he "did not want to have to waste his time responding to memos ... which are meant to be self serving and do not address the substantive issues." Pl.'s Ex. L at 107. The exchange culminated in an e-mail sent to Staff by Duthie, on March 10, 1999, which read:

> I am writing this memo to advise you that some of the language in your memo to me, dated March 5, 1999, on the subject of your recent performance review is insubordinate. While the Company respects the right of its employees to submit written comments on their performance appraisals, your most recent comments are insubordinate in that they maliciously accuse me of knowingly and intentionally making false statements in your appraisal, of unlawfully retaliating against you, and of sending you a "self serving" memo. I have previously denied any such improper motives and now deny these latest accusations. At Pall, it is our practice that employees address their supervisor and fellow workers respectfully, even if, in the case of a supervisor, an employee takes issue with the substance of the supervisor's appraisal of the employee's job performance. Inflammatory and malicious accusations of my motivations will not be tolerated. Please refrain from using insubordinate language in communicating with me in the future. A failure to do so may give rise to disciplinary action.
>
> (Pl.'s Ex. L at 0174.)

The Court need not resolve whether or not Duthie was justified in accusing Plaintiff of using insubordinate language. Suffice it to say that no reasonable trier of fact could conclude that Duthie's response to Plaintiff's e-mail gave rise to a racially abusive work environment. Duthie's statement was addressed solely to the tone of Plaintiff's e-mail. There is nothing in it that suggests any harassment or offensive content on the basis of race or national origin.

More importantly, even assuming Plaintiff's allegations to be true—in 1996, when he was promoted, he did not receive an office or subordinates to supervise; in 1998, Salinaro lied to him about anticipated work in R & D; and in 1999, Duthie improperly accused him of insubordination—as a matter of law, these three acts (as to which there is no evidence of racially motivated animus), committed over the course of three years, are insufficient to give rise to an actionable claim of a hostile work environment. These episodic, relatively insignificant events are not "severe or pervasive enough to create an objectively hostile or abusive work environment." *Alfano*, 294 F.3d at 373–74. Indeed, the Second Circuit's review, in *Alfano*, of hostile environment cases where the evidence was found insufficient as a matter of law to alter the terms and conditions of a plaintiff's employment, makes it manifestly clear that Staff does not come close to demonstrating an objectively actionable hostile work environment. *See Alfano*, 294 F.3d at 379–81.

Moreover, the subjective element, not to mention the sincerity, of Plaintiff's hostile work environment claim, is belied by his own testimony. At Staff's deposition, the following exchange ensued:

> Q: Do you feel that at any point in your employment you were harassed on account of your race?
>
> [Plaintiff's counsel objects as to form]
>
> Q: I am asking, Mr. Staff, what you perceived. Do you believe that you were harassed at any time during your employment?
>
> [Plaintiff's counsel renews objection]

A: No.

(Def.'s Ex. D at 489.)

Accordingly, the Court recommends that Defendants' motion for summary judgment be granted with respect to Plaintiff's hostile work environment claim.

*VI. Defendants' Request for Sanctions*

In their Reply Memorandum, Defendants seek sanctions against Plaintiff's counsel for his untimely discovery applications and dilatory tactics. Defendants fail to point to Plaintiff's violation of any Court orders, focusing primarily on his belated requests for relief and the resultant delay in submission of the instant summary judgment motion. Although the Court agrees that Plaintiff's counsel made untimely requests for discovery and Court relief, the Court does not view counsel's conduct as sanctionable. Accordingly, I recommend that Plaintiff's application for sanctions be denied.

### CONCLUSION

For the reasons set forth above, I respectfully recommend that Defendants' motion for summary judgment be granted, and that this action be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. See also Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);

*IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), cert. denied, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989).

October 17, 2002.