**John REITER, Plaintiff,**

v.

**METROPOLITAN TRANSPORTATION AUTHORITY OF the State of NEW YORK, MTA New York City Transit, and Mysore L. Nagaraja, P.E., Individually and as Senior Vice President and Chief Engineer, Defendants.**

No. 01 Civ. 2762(GWG).

United States District Court, S.D. New York.

Sept. 10, 2004.

---

158

See also 2004 WL 2072369.

Gregory G. Smith, Gregory Smith & Associates, New York, NY, for Plaintiff.

Steven M. Stimell, Bryan Cave LLP, New York, NY, for Defendant New York City Transit Authority.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Plaintiff John Reiter brought this action in April 2001 against his employer, the New York City Transit Authority ("NYCTA"); his former supervisor, Mysore L. Nagaraja; and the Metropolitan Transportation Authority of the State of New York seeking damages and injunctive relief for allegedly discriminatory and retaliatory conduct that he suffered as an employee of the NYCTA. On July 27, 2001, the NYCTA served Reiter with an Offer of Judgment pursuant to Fed.R.Civ.P. 68 in the amount of $20,001 plus reasonable attorney's fees and court costs incurred through that date. Reiter did not accept the Offer.

The case proceeded to a jury trial in January 2003, with the NYCTA as the sole remaining defendant. The jury returned a verdict in Reiter's favor and awarded him $140,000 in compensatory damages. Following the NYCTA's post-trial motion for remittitur pursuant to Fed.R.Civ.P. 59(e), however, the court held that the jury's award of damages was excessive and that it would order a new trial on the issue of damages unless Reiter agreed to a remittitur reducing the award to $10,000. Reiter agreed to the remittitur.

Reiter has now applied for an award of attorney's fees in the amount of $457,155 and court costs in the amount of $12,090.72. The parties have consented to disposition of the application by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). While not disputing that Reiter is entitled to reasonable attorney's fees and court costs, the NYCTA maintains that its Offer of Judgment cut off Reiter's right to such fees and costs incurred after the date the Offer was made. For the reasons stated below, the Court agrees that Reiter is not entitled to reimbursement from the NYCTA of such fees and costs. As described in a separate decision issued this date, Reiter's reasonable attorney's fees and court costs up to and including the date of the Offer are $17,075.42 and thus he is entitled to a judgment for this amount only.

## I. INTRODUCTION

### A. Factual Background

The facts underlying this case are set forth in *Reiter v. Metropolitan Transportation Authority*, 2003 WL 22271223, at *3–*6 (S.D.N.Y. Sept.30, 2003). In brief, the NYCTA provides public transportation in New York and is comprised of several departments, including Capital Program Management ("CPM"), which is responsible for ma-

jor architectural and engineering projects. (Reiter: Tr. 49).[1] In 1999, Reiter was employed by the NYCTA as Deputy Vice President of Engineering Services ("DVP Engineering") at an annual salary of $118,728. (Reiter: Tr. 46–47, 183, 278). The Engineering Services department was responsible for major NYCTA engineering projects, had an annual budget in excess of one billion dollars, and comprised approximately 900 staff members. (Reiter: Tr. 46–47, 49, 78–82, 129–30, 139, 150). As the head of Engineering Services, Reiter reported directly to the Senior Vice President and Chief Engineer of CPM. (Reiter: Tr. 47, 50, 52; Nagaraja: Tr. 396, 449).

On January 31, 2000, Reiter received his annual performance review, which gave him a rating of "marginal." (Reiter: Tr. 92, 107–08). On March 25, 2000, Reiter filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that he received the "marginal" review in retaliation for his wife bringing her own EEOC charge against the NYCTA alleging discrimination and harassment. (Reiter: Tr. 98–100, 118–20).

On June 1, 2000, Reiter was transferred to the position of Deputy Vice President of Technical Services ("DVP Technical"). (Reiter: Tr. 120, 149–50). The Technical Services department was responsible for working with the customers of CPM on the acceptance of capital projects. (Carter: Tr. 372; Nagaraja: Tr. 470–71). Its role was to ensure that capital projects built by CPM could be used by customers and were capable of being maintained by them. (Carter: Tr. 372; Nagaraja: Tr. 470–71). In his new position Reiter retained the same title of Deputy Vice President, the same fringe benefits, and the same salary as before the transfer. (Reiter: Tr. 273; Nagaraja: Tr. 471). He received positive evaluations for his 2000 and 2001 employment reviews and also received the standard three percent annual raise in 2001 and 2002, giving him a total annual salary of $125,956. (Reiter: Tr. 267–70, 279–80).

The Technical Services department, however, was relatively small (10 or 11 employees) and according to Reiter played a less critical role within CPM compared with the Engineering Services department. (Reiter: Tr. 78–82, 150). Reiter contrasted the two positions as follows:

> The title may sound the same but engineering services and technical services are worlds apart in many respects. One of the requirements for heading up engineering services is to be a licensed engineer or a licensed architect, for instance. That is not a requirement to head up technical services.
>
> . . . .
>
> And [DVP Engineering] was a division head, meaning reported directly to the head of the department. [DVP Technical] was not a division head. I mean, I reported to someone else who reported to the department head. In engineering services I had overall responsibility for 900 people. In technical services I had no staff. Technical services in total is only about ten or 11 people. None of them reported to me. I had no written job description. The managerial position questionnaire, which was the job description for [DVP Engineering], no such thing existed for the assignment that I was given in technical services.

(Reiter: Tr. 150).

Reiter testified that his transfer from DVP Engineering to DVP Technical was the equivalent of a demotion for several reasons. First, he stated that he was transferred to a position that did not have any "Hay Points." (Reiter: Tr. 150, 181–82, 271). According to Reiter:

> The Hay Points System ranks the importance and/or difficulty of various positions. [ (Reiter: Tr. 83) ]. The salary and compensation structures are based on the Hay points system and by definition a lateral transfer is a transfer [from] a managerial position to a managerial or executive position with little or no change in Hay points. [ (Reiter: Tr. 182–84) ].

*Reiter*, 2003 WL 22271223, at *4. Reiter went from having 1560 Hay Points as DVP Engi-

---

1. "Tr." refers to pages of the trial transcript  (Docket # 72).

neering to zero Hay Points as DVP Technical. (Reiter: Tr. 181–82). However, Reiter indicated that the position of DVP Technical "never had Hay points assigned to it" (Reiter: Tr. 181) because the position had only recently been created (Reiter: Tr. 150–51, 271–72). Second, whereas in his position as DVP Engineering Reiter had responsibility for the 900 staff members in the department (including seven or eight executives who directly reported to Reiter), as DVP Technical Reiter had no direct reports in a unit of 10 or 11 employees. (Reiter: Tr. 80–82, 150). Third, Reiter lost his "confidential secretary" when he was transferred and received the assistance of a secretary whom he felt was "not at all at the same level as the secretary that [he] had" as DVP Engineering. (Reiter: Tr. 151). Fourth, Reiter was moved from his corner office on the seventh floor to another office on the second floor. (Reiter: Tr. 152–54). Reiter explained the significance of this relocation as follows:

Q. Now, what is significant about moving from the seventh floor to the second floor?

A. Well, one of what I consider to be the most significant was the fact that technical services, which was the group I was now assigned to, was all located on the eighth floor and the elevators in the building are in banks that go to different floors and one bank goes to floors 1 through 5 and another bank goes from floors 5 through 9. So for me to see members of the group that I was assigned to I had to take an elevator from the second floor to the fifth floor, then get off the elevator and then get on another elevator from the fifth floor to the eighth floor. It was a two-elevator ride.

. . . .

Q. And what about the office, how were your offices different from [DVP Engineering] to [DVP Technical]?

A. Well, my Engineering Services office was a corner office, located in the front of the building, which meant it looked out on Broadway, and it was approximately 240 to 250 square feet, had executive furniture, and all of that, and was large enough to have a conference table in it, okay.

The office that I was moved to was about 170 square feet, different furniture,

open book case instead of closed book case, that type of thing. Not, not large enough to have a conference table, there was no conference table, and looked out on—it's actually a one block street called Marketfield Street, but it [looks] like it's [a] dead end, looks like an alley, and you look out the window of the office and [it] looks like you're looking at some old run down tenements in an alley.

(Reiter: Tr. 152–54). Finally, Reiter testified that he had no specific assigned job responsibilities or functions as DVP Technical and did not have projects to keep him busy for an entire work day. (Reiter: Tr. 158–59).

Beginning in November 2002, when the Vice President of Technical Services retired, Reiter took over the responsibilities of running the Technical Services department on a day-to-day basis. (Carter: Tr. 372, 385). His workload increased, he acquired eight direct reports, a "confidential secretary" was assigned to him, and he was given a new fourth-floor office. (Reiter: Tr. 277–78, 287; Carter: Tr. 385).

### B. *The Complaint*

Reiter filed the original complaint in this action on April 2, 2001 and an amended complaint on July 5, 2001. The amended complaint raised claims under Title VII of the Civil Rights Act of 1964 alleging that Reiter was subject to retaliation in the form of verbal reprimands, negative performance reviews, and demotion because both he and his wife had complained of discrimination and filed complaints with the EEOC. *See* Amended Complaint, filed July 5, 2001 (Docket # 4) (reproduced as Ex. 3 to Affirmation of Steven M. Stimell in Opposition to Plaintiff's Motion for Attorneys' Fees and Costs, filed March 3, 2004 (Docket # 104) ("Stimell Affirm.")), ¶¶ 13–22, 31. Reiter also contended that the defendants discriminated against him on the basis of race, in violation of Title VII and 42 U.S.C. § 1981, and on the basis of marital status, in violation of Title VII and the New York Human Rights Law. *See id.* ¶¶ 24–26, 31. In addition, the amended complaint alleged disparate treatment on the basis of race, gender, and marital status under

Title VII. *See id.* ¶¶ 25, 31. Finally, Reiter alleged violations of 42 U.S.C. § 1983 and of his due process rights. *See id.* ¶¶ 1–2. The amended complaint sought compensatory and punitive damages and various forms of equitable relief. *See id.* at 10–11.

Concerning his retaliation claim, Reiter alleged five principal instances of retaliation attributable to the EEOC complaints filed by him and his wife: (1) a negative oral evaluation in October 1999; (2) additional reporting obligations in December 1999; (3) the "marginal" performance review in January 2000; (4) his exclusion from a meeting that took place in January 2000; and (5) the June 1, 2000 transfer from DVP Engineering to DVP Technical. *See id.* ¶¶ 18–22.

### C. Offer of Judgment

On July 27, 2001, the NYCTA served Reiter with an Offer of Judgment under Fed. R.Civ.P. 68 in the amount of $20,001, "together with costs and reasonable attorneys [sic] fees accrued in this litigation to date." Offer of Judgment, dated July 27, 2001 ("Offer of Judgment" or "Offer") (reproduced as Ex. 1 to Stimell Affirm.), at 1; *see* Stimell Affirm. ¶ 2. Reiter did not accept the Offer of Judgment within the 10–day period required for acceptance, *see* Stimell Affirm. ¶ 2, and thus, under the terms of Fed.R.Civ.P. 68, the Offer was "deemed withdrawn."

### D. Pre–Trial Motions for Summary Judgment

Following discovery, the parties moved for summary judgment pursuant to Fed.R.Civ.P. 56. On September 30, 2002, the court denied Reiter's motion for summary judgment in its entirety and granted defendants' motion for summary judgment dismissing all claims except Reiter's claim against the NYCTA that he was subjected to retaliation by being "demoted" in June 2000 from DVP Engineering to DVP Technical because he had filed an EEOC complaint in March 2000. *See Reiter v. Metro. Transp. Auth.,* 2002 WL 31190167, at *5–*14 (S.D.N.Y. Sept.30, 2002). The court determined that there was "a genuine issue of material fact as to whether there was a causal connection between [Reiter's] filing of the March EEOC complaint and his June,

2000 transfer." *Id.* at *11. All of Reiter's other claims were dismissed. *See id.* at *14.

### E. Trial

The case was thereafter divided into legal and equitable issues, with the jury to make findings on the issues of liability and compensatory damages and with the court to order any equitable relief pursuant to 42 U.S.C. § 2000e–5(g)(1). *See Reiter,* 2003 WL 22271223, at *1. Following a six-day jury trial, on January 23, 2003 the jury returned a verdict in favor of Reiter and awarded him $140,000 in compensatory damages for pain and suffering. *See id.;* Tr. 691.

Concerning Reiter's requests for equitable relief, the court denied him back pay, front pay, restoration of vacation time, pre-judgment interest, and a permanent injunction to prevent the NYCTA from retaliating against him in the future. *See Reiter,* 2003 WL 22271223, at *14–*16. Reiter also requested "reinstatement" to the position of "Vice President of Engineering Services"—an "enhanced position" that was created by the NYCTA only after Reiter was transferred to DVP Technical. *See id.* at *11–*14. The court ordered that Reiter be reinstated not to this newly-created position but rather to his former position of DVP Engineering, with only the responsibilities he held prior to being transferred to DVP Technical. *See id.* at *14, *16. The court ordered that Reiter's salary remain at its then-current level, which was $125,956, and that his Hay Point rating be set at 1560, the same as it was when he was transferred. *See id.* at *5, *14, *16. In addition, Reiter was awarded a "confidential secretary" and an office comparable to the one he had prior to the transfer. *See id.* at *14, *16. *See generally* Judgment, filed October 24, 2003 (Docket # 92) ("Judgment"), at 3.

### F. The NYCTA's Post–Trial Motions

After the verdict, the NYCTA moved for judgment as a matter of law under Fed. R.Civ.P. 50(a) and to vacate the jury award under Fed.R.Civ.P. 50(b). *See Reiter,* 2003 WL 22271223, at *1. In the alternative, the NYCTA moved for a new trial pursuant to

Fed.R.Civ.P. 59(a) or for remittitur pursuant to Fed.R.Civ.P. 59(e). *See id.*

On September 30, 2003, the court held that the jury's damages award of $140,000 was "shockingly excessive in light of the minimal evidence of actual emotional distress damages and the objective details of the retaliation." *Id.* at *8. The court further held that "an award for compensatory damages in excess of $10,000 would shock the judicial conscience." *Id.* at *11. Accordingly, the court granted the NYCTA's motion for remittitur pursuant to Fed.R.Civ.P. 59(e) and indicated that it would order a new trial on the issue of compensatory damages unless Reiter agreed to a remittitur reducing the award to $10,000, with post-judgment interest. *Id.* at *11, *15–*16. Reiter subsequently agreed to the reduced award. *See* Judgment at 3.

### G. *The Instant Motion*

Reiter has now moved for an award of $457,155 in attorney's fees—for 1713.30 hours of work performed by three attorneys who represented him during the proceedings—and $12,090.72 in court costs. *See* Motion for Attorney's Attorney's [sic] Fees and Costs, filed November 12, 2003 (Docket # 93). While not disputing that Reiter is entitled by statute to reasonable attorney's fees and court costs, the NYCTA maintains that its July 27, 2001 Offer of Judgment limits Reiter's fees and costs to those incurred up to and including the date the Offer was made. *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Attorneys' Fees and Costs, filed March 3, 2004 (Docket # 105), at 9–14. Reiter argues not that the Offer was ambiguous or otherwise invalid but rather that the final judgment of $10,000 combined with the equitable relief he received is more favorable than the $20,001 Offer. *See* Plaintiff's Memorandum of Law in Reply in Further Support of His Motion for Attorneys' Fees and Costs, filed May 3, 2004 (Docket # 112) ("Pl. Reply Mem."), at 3–11.

## II. *APPLICABLE LEGAL PRINCIPLES*

42 U.S.C. § 2000e–5(k) provides that a "prevailing party" in an action under Title VII may recover, in the court's discretion, "a reasonable attorney's fee (including expert fees) as part of the costs." *See also, e.g., Am. Fed'n of State, County & Mun. Employees v. County of Nassau,* 96 F.3d 644, 650 (2d Cir.1996) ("An award of fees under Title VII is within the discretion of the trial court . . . ." (internal quotation marks and citation omitted)), *cert. denied,* 520 U.S. 1104, 117 S.Ct. 1107, 137 L.Ed.2d 309 (1997). The jury's verdict in Reiter's favor makes him a "prevailing party" and, because there are no "special circumstances" justifying a denial of fees, he is entitled to recover reasonable attorney's fees as part of the costs assessed against the NYCTA. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414–15, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Robinson v. Instructional Sys., Inc.,* 80 F.Supp.2d 203, 210 (S.D.N.Y.2000), *aff'd in part and vacated in part on other grounds,* 259 F.3d 91 (2d Cir.2001).

Fed.R.Civ.P. 68 provides that "[a]t any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party . . . to the effect specified in the offer, with costs then accrued." The purpose of this rule is "to encourage the settlement of litigation." *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 352, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981); *accord Marek v. Chesny,* 473 U.S. 1, 5, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) ("[Rule 68] prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits."). If the offer of judgment is rejected, Fed.R.Civ.P. 68 provides that "the offeree must pay the costs incurred after the making of the offer" if "the judgment finally obtained by the offeree is not more favorable than the offer." Because Title VII includes attorney's fees in its definition of costs, attorney's fees are also covered by the cost-shifting provision of Fed.R.Civ.P. 68. *See, e.g., Wilson v. Nomura Sec. Int'l, Inc.,* 361 F.3d 86, 89 (2d Cir.2004); *Lyte v. Sara Lee Corp.,* 950 F.2d 101, 103 (2d Cir.1991); *see also Marek,* 473 U.S. at 9, 105 S.Ct. 3012. Therefore, if the final judgment is not "more favorable" than the offer of judgment, a prevailing

plaintiff cannot recover attorney's fees and court costs for the period after the offer of judgment was made. *See, e.g., Marek,* 473 U.S. at 5, 9, 105 S.Ct. 3012; *Knoeffler v. Town of Mamakating,* 126 F.Supp.2d 305, 315 (S.D.N.Y.2000); *Christian v. R. Wood Motors, Inc.,* 1995 WL 238981, at *6 (N.D.N.Y. Apr.21, 1995).

## III. *DISCUSSION*

### A. *Law Governing Rule 68 and Equitable Relief*

The comparison of an offer and a final judgment for purposes of Rule 68 is simple when each consist of only a monetary award. Difficulties arise, however, if one or both of them incorporate equitable relief, such as an injunction or a declaratory judgment, because equitable relief is not susceptible of a ready comparison either with monetary relief or even with a differing form of equitable relief.

Despite these difficulties, when equitable relief is compared with equitable relief courts have typically arrived at some basis upon which to make a comparison. For example, in *Garrity v. Sununu,* 752 F.2d 727, 728–29, 732–33 (1st Cir.1984), a disability discrimination class action against a state-run institution for the handicapped, the court found that the judgment obtained was more favorable than the Rule 68 offer by the state to provide certain services because the offer was indefinite and ambiguous, setting forth no dates for compliance, while the final judgment set forth specific dates by which the institution had to complete each step for the restructuring of its services. *See also Local 32B–32J, Serv. Employees Int'l Union v. Port Auth. of N.Y. & N.J.,* 180 F.R.D. 251, 253 (S.D.N.Y.1998) (in action seeking right to protest at the World Trade Center plaza, judgment more favorable than offer because, *inter alia,* offer allowed only 18 demonstrators on plaza whereas judgment allowed at least 25 and prohibited exercise of discretion in the awarding of protest permits); *Lightfoot v. Walker,* 619 F.Supp. 1481, 1484–86 (S.D.Ill.1985) (in suit by prisoners regarding health care services, judgment more favorable than offer because of the greater benefits provided prisoners, such as a court-ordered medical examination of each prisoner, which was not provided for in the offer), *aff'd,* 826 F.2d 516 (7th Cir.1987); *Ass'n for Retarded Citizens of N.D. v. Olson,* 561 F.Supp. 495, 498–99 (D.N.D.1982) (in action challenging the conditions of confinement of mentally handicapped individuals, offer of various forms of equitable relief was not more favorable than a final judgment awarding solely equitable relief because, *inter alia,* the offer "contains caveats which make the dictates of the offer precatory rather than mandatory"), *aff'd as modified on other grounds,* 713 F.2d 1384 (8th Cir.1983), *cert. denied,* 519 U.S. 993, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996); *cf. RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773, 778, 780, 781 & n. 8 (8th Cir.1988) (judgment of $2500 in statutory damages plus an injunction was more favorable than offer of $2000 plus defendants' consent to an injunction because, in addition to the fact that "the money judgment [defendants] had offered was not as favorable as that [plaintiff] actually obtained," the offered injunction did not include certain relief afforded in the final injunction). *See generally Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 58 P.3d 608, 640 (2002) (Ramil, J., concurring) (surveying the case law—including *Marek, Garrity, Lightfoot,* and *Ass'n for Retarded Citizens of North Dakota*—and concluding that "in evaluating the favorableness of equitable relief, courts should consider" at least three factors—timeliness, comprehensiveness, and specificity—which the Court construes to be principles of "certainty").

Reiter's case, however, presents a far more difficult problem: not the comparison of two types of equitable relief alone—which at least have the potential of being judged on the same terms—but rather a comparison of two utterly different and unrelated forms of relief. Once the award of $10,000 is taken from both sides of the equation (that is, from both the offer and the final judgment), what is left is a comparison of a cash payment of $10,001 with the equitable relief granted to Reiter in the final judgment. Justice Brennan in a dissenting opinion foresaw the problem in making a comparison of this kind

under Rule 68 in some circumstances when he noted that "it is altogether unclear how the Court intends judges to go about quantifying the 'value' of the plaintiff's success" where "a plaintiff recovers less money than was offered before trial but obtains potentially far-reaching injunctive or declaratory relief." *Marek*, 473 U.S. at 32, 105 S.Ct. 3012 (Brennan, J., dissenting).

Some courts faced with this situation have simply refused to make the comparison. For example, in *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 850 F.Supp. 224, 228 (S.D.N.Y.1994), a patent infringement case, the defendant extended the plaintiff an offer of judgment of $2,000,000. Plaintiff rejected the offer and ultimately recovered at final judgment $815,242.21 in royalties and equitable relief consisting of, *inter alia*, a permanent injunction preventing future patent infringement. *Id.* at 227–28. The court declined to consider at all the equitable relief awarded at final judgment for purposes of Rule 68, stating that there was "a serious question whether non-monetary relief may be included in computing the relative favorability of offer and judgment under Rule 68" and that "even if such relief is includable as an element of comparison, it is more than problematic as to how it should be valued." *Id.* at 229. Accordingly, the court held that the final judgment was not more favorable than the offer of judgment. *Id.; see also Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 664 n. 21 (4th Cir.1990) (characterizing as a "thorny issue[ ]" whether "a court should try to compare pecuniary with nonpecuniary relief"), *overruled on other grounds by Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

Similarly, in *Real v. Continental Group, Inc.*, 653 F.Supp. 736, 738 (N.D.Cal.1987), the defendants extended a Rule 68 offer of $35,000 in back pay, $7000 in attorney's fees then accrued, and injunctive relief of reinstatement of the terminated plaintiff to his former position. After having declined the offer, the plaintiff ultimately consented to a remittitur of $50,000, with no equitable relief. *See id.* at 737–38. The defendants argued that the court should value the equitable relief of reinstatement (which, through expert testimony, defendants argued was valued at $300,000), add that value to the monetary figures in the Rule 68 offer, and then compare that sum to the ultimate judgment of $50,000. *See id.* at 738. The court declined to do so:

> How does one quantify the value of injunctive relief?
>
> . . . .
>
> Although I find the defendants' contention to be plausible, I decline to apply it in the instant case. Defendants' theory raises the problem identified by Justice Brennan in his dissent to *Marek:* The *Marek* majority provides no guidance for assessing the value of nonpecuniary relief offered as part of a Rule 68 offer.
>
> The imprecision inherent in making such an evaluation for the purposes of the *Marek* comparison persuades me that, without more direction, the better course is to compare monetary awards only.

*Id.* at 738–39 (citation omitted). Because it valued the relief of reinstatement as zero, the court concluded that the plaintiff was entitled to attorney's fees accruing subsequent to the making of the offer. *See id.* at 739.

In contrast with *BIC Leisure Products* and *Real*, some courts have struggled to make the comparison on some basis. One treatise describes the difficulty of this exercise as involving a situation where "the courts must try to compare apples and oranges as best they can." 12 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice and Procedure* § 3006.1, at 128 (2d ed.1997); *see* 13 James Wm. Moore, *Moore's Federal Practice* § 68.07(3), at 68–41 (3d ed.2004) (indicating that "no sharply articulated approach has emerged in the cases to date"); *see also Jolly v. Coughlin*, 1999 WL 20895, at *7 (S.D.N.Y. Jan.19, 1999) ("The question of whether an offer of judgment is properly comparable to the judgment finally obtained must be decided on the individual facts of each case.").

The few cases undertaking the "apples" to "oranges" comparison have at least involved a comparison of a money offer with the award of something that could be characterized as a form of property right, albeit a nontangible one. *Lish v. Harper's Magazine*

*Foundation,* 148 F.R.D. 516, 519–20 (S.D.N.Y.1993), for example, concluded that a declaratory judgment of copyright infringement was more favorable than an offer of $250. Similarly, *Domanski v. Funtime, Inc.,* 149 F.R.D. 556, 557–58 (N.D.Ohio 1993), concluded that a judgment of $5581.90 and a permanent injunction against copyright infringement was more favorable than an offer of $9500. *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 749 F.Supp. 331, 332–33 (D.Mass.1990), *aff'd in part and rev'd in part on other grounds,* 940 F.2d 744 (1st Cir. 1991), viewed a judgment of $653,682, an injunction to retain certain franchises for a three-year period, and a rent freeze order as more favorable than a $700,000 offer. In these cases, the equitable relief in the judgment had some potential economic value—for example, the ability to operate a franchise or to make unfettered use of a copyright—making the equitable relief subject to a comparison on economic terms with the monetary relief in the offer. *See, e.g., id.* at 333 (plaintiffs "received very real benefits in the form of being allowed to retain their franchises for at least a three-year period"). In the instant case, however, neither party has suggested that there was some special economic value to Reiter of the equitable relief contained in the final judgment.

In the end, case law provides virtually no guidance as to how equitable relief should be compared with monetary relief for purposes of the Rule 68 analysis. Indeed, as discussed, there is even support for the proposition that equitable relief should not be valued at all for purposes of Rule 68. *See, e.g., Real,* 653 F.Supp. at 738–39. While this Court doubts that such a broad rule is sustainable, it is not necessary to reach the question here because, as discussed below, even if the equitable relief obtained by Reiter is considered in the Rule 68 analysis, this relief combined with the $10,000 judgment is not more favorable than the Offer.

### B. *Comparison of Reiter's Judgment with the Offer*

As noted, the issue in this case boils down to whether the equitable relief Reiter received in the final judgment is more favorable than a cash payment of $10,001. Reiter's argument is that "the value of an upgraded executive title and supervisory responsibilities for hundreds of employees and over one billion dollars in budgetary expenditures, combined with a corner office located on a high floor in Manhattan and a confidential secretary and status re-establishment of Hay Points is worth over $10,000.00." Pl. Reply Mem. at 11.

The final judgment reflects that Reiter's equitable relief entailed the following: (1) reinstatement to the position of DVP Engineering, with 1560 Hay Points and a salary at least at its then-current level; (2) a "confidential secretary"; and (3) relocation to an office comparable to the office he had prior to the transfer to DVP Technical. *See* Judgment at 3. We address each element below.

First is reinstatement. Often, when reinstatement is awarded in employment discrimination cases, the plaintiff either is not working at the time of the judgment or is employed in a position with a lower salary. In such an instance—particularly where the plaintiff had no hope of independently obtaining a job with a salary equivalent to what the plaintiff received via the judgment—there may be a basis to determine that the reinstatement has a monetary value by means of a comparison between the reinstated salary and benefits and what the plaintiff would have been expected to earn in the absence of the judgment. Here, however, Reiter received absolutely no increase in salary or tangible employment benefits by being reinstated to DVP Engineering. Instead, his salary remained at its then-current level, which was actually higher than it was when he was originally transferred to DVP Technical. Accordingly, Reiter obtained no economic benefit whatsoever by being reinstated to DVP Engineering. Nor is there any evidence to support a potential claim that holding the DVP Engineering position would create some special economic benefit for Reiter in the future.

▮ Reiter argues rather that there were certain non-economic benefits to reinstatement that must be considered for purposes of the Rule 68 analysis—specifically, he asserts that the DVP Engineering position

carries superior "status" within the NYCTA, Pl. Reply Mem. at 5, as reflected by the number of direct reports, the placement of the office, and the importance of the job within the agency. *Id.* at 4–5. The problem with this appeal to "status," however, is that there is simply no basis upon which to quantify it—or, more precisely, to compare a dollar figure (that is, $10,001) with the value of having a job with such superior "status," as Rule 68 requires. In addition, acquiring a job with superior "status" may be of great significance to some individuals, who might willingly pay money to obtain it, and absolutely meaningless to others, who would gladly take even a small amount of cash in exchange for giving up such status. Reiter's own personal evaluation of the value of such status cannot form part of the calculus, however, as Rule 68 would become unworkable if it were not based on an objective consideration of the relief awarded in the judgment with the relief contained in the offer. Moreover, any emotional distress that Reiter suffered as a result of the loss of status must be taken out of the calculus entirely, as his emotional distress from suffering the loss of status as well as of any other perquisites of the DVP Engineering job—such as the loss of a corner office or a "confidential secretary"—was compensated in full by the award of $10,000 in damages.

While the Court would be inclined to accord some monetary value to the superior status of the DVP Engineering position, including its various perquisites, it cannot say that it would be any great amount when considered from an objective observer's point of view. Moreover, the Court must also consider the time period for which Reiter acquired such status. This is not a case where the NYCTA is required by the judgment to keep Reiter in this position for even a single day past the entry of judgment. Indeed, the court's decision regarding equitable relief specifically noted that Reiter's job functions and direct reports "shall remain flexible and may be changed for legitimate business reasons." *Reiter,* 2003 WL 22271223, at *14. While Reiter enjoys statutory protections from being fired for discriminatory or other improper reasons (as do virtually all employees), he could be fired at any time based on

reasons of performance and could have his job altered for legitimate business reasons—as was true prior to his being transferred out of the DVP Engineering position. Thus, the Court must compare the value of being in the DVP Engineering job for some unknown period with the certainty of receipt of $10,001. Looking at the issue from the viewpoint of an objective, reasonable person, the Court concludes that, even accepting as true Reiter's assertions as to the job's superior "status," the enjoyment of such status is of limited value and certainly is not objectively more favorable than a $10,001 payment.

The case of *Stokes v. City of Montgomery,* 157 F.R.D. 514 (M.D.Ala.1994), is of no relevance here because the *Stokes* court was called upon to compare only reinstatement to one position with reinstatement to another position. While *Stokes* found the position secured by the judgment to be more favorable, *see id.* at 518, there was no monetary gap—here, $10,001—to be accounted for. Thus, the court in *Stokes* was never called upon to compare the objective value of the position awarded in the judgment with the objective value of the offered position and to then determine whether the difference exceeded some dollar amount. The cases relied upon by Reiter in his brief also do not alter the Court's conclusion. *Chestnut Hill Gulf, see* Pl. Reply Mem. at 8, determined that a judgment of $653,682, an injunction to retain 16 franchises for a three-year period, and a rent freeze order was more favorable than a $700,000 offer of judgment. *See* 749 F.Supp. at 332–33. The court found that the plaintiffs had "received very real benefits in the form of being allowed to retain their franchises for at least a three-year period." *Id.* at 333. Although the court did not quantify this benefit, it certainly would appear that the economic value of retaining 16 franchises for a three-year period would be greater than the $46,318 difference between the offer and the final judgment. In *Domanski, see* Pl. Reply Mem. at 8–9, the court held that a judgment of $5581.90 and a permanent injunction against copyright infringement was more favorable than an offer of $9500. *See* 149 F.R.D. at 557–58. The court stated that "[t]his permanent injunctive relief,

though admittedly difficult to quantify, adds considerable value" to the judgment because "[a]bsent injunctive relief, [the defendant] could have conceivably continued to infringe [the plaintiff's] copyright, making the recovery of $9500 in this one case practically worthless and certainly meaningless." *Id.* at 558 & n. 2. Thus, the $9500 offer of judgment meant nothing to the plaintiff unless it was also accompanied by permanent injunctive relief preventing the same type of copyright infringement in the future. Reiter's reinstatement, by contrast, does not prevent the status of that job from being altered through a change in job responsibilities or other perquisites. Nor does it prevent him from being terminated at any time in the future. Indeed, the judgment does not even provide court supervision over any claims of future unlawful retaliatory conduct by the NYCTA inasmuch as the court denied Reiter's request for a permanent injunction forbidding the NYCTA from retaliating against him. *See Reiter*, 2003 WL 22271223, at *15.

In *Lish*, the court concluded that a declaration that a copyright infringement had occurred as a result of the unauthorized publication of a letter was more favorable than an offer of judgment of $250, without any admission of liability. *See* 148 F.R.D. at 518–20. While the final judgment did not encompass a permanent injunction preventing future copyright infringement, the court found that the judicial determination of a copyright violation embodied in the final judgment conferred a "benefit" on the plaintiff because he could use the court's finding of a copyright violation in future cases. *Id.* at 520. Again, Reiter's reinstatement—while it might have some evidentiary significance in a future case—did not prevent or make unlawful a future firing from his job or a changing of his job responsibilities.

Reiter makes much of the fact that the reinstatement raised his Hay Point rating from zero to 1560—the level it was at when he was transferred to DVP Technical—and argues that the restoration of this "objective measure of a positions [sic] value in terms of responsibility, complexity, and salary," Pl. Reply Mem. at 4, makes the judgment more valuable than the Offer. *See id.* at 4–6, 11.

In effect, Reiter's argument is that the restoration of what he feels is a measure of his seniority was a substantial and quantifiable economic benefit. But Reiter testified that the fact that DVP Technical "never had Hay points assigned to it" (Reiter: Tr. 181) was an indication only "that the position had never had a job description written for it and evaluated" since the position had only recently been created (Reiter: Tr. 150–51, 271–72). Moreover, Reiter's argument flies in the face of the fact that no change to his salary or benefits was effected by the restoration of his 1560 Hay Points. (*See generally* Reiter: Tr. 273 ("Q. But the fact whether or not ... you have hay points or not hasn't affected your salary, has it not; isn't that correct? A. That's correct.")). Indeed, Reiter's salary actually *increased* during his tenure as DVP Technical, even though he never had any Hay Points throughout that entire period. (Reiter: Tr. 279–80). Thus, the restoration of the Hay Points had no practical or economic significance.

■ In the end, Reiter's reinstatement to the position of DVP Engineering, with the restoration of his 1560 Hay Points and the maintenance of his salary at least at its then-current level, does not make the injunctive portions of the final judgment more favorable than a $10,001 payment. The other equitable relief Reiter received does not alter this result. Although Reiter was awarded a "confidential secretary" comparable to the one he had prior to his transfer, *see* Judgment at 3, he had been assigned a new secretary—albeit not a "confidential" one—when he was transferred to DVP Technical (Reiter: Tr. 151–52). Although he states that the new secretary was "not at all at the same level as the secretary that [he] had" as DVP Engineering (Reiter: Tr. 151), the record is devoid of any evidence as to what this meant in terms of the support services he was provided. In any event, there is simply nothing in the record to indicate any quantifiable, objective benefit Reiter received by being awarded the "confidential secretary." In addition, while Reiter received in the final judgment "an office comparable to the office he previously had while" DVP Engineering, Judgment at 3, any quantifiable benefit Reiter received from this new office was minimal, if

anything. In an analogous area, case law holds that the mere fact that an employee has lost desirable office space does not by itself constitute even an adverse employment action within the meaning of Title VII. *See, e.g., Staff v. Pall Corp.*, 233 F.Supp.2d 516, 532 (S.D.N.Y.2002) (citing cases), *aff'd,* 76 Fed.Appx. 366, 2003 WL 22056230 (2d Cir. Sept.4, 2003).

In sum, the Court does not view any of the various injunctive elements of the final judgment as having any significant value. Of course, Reiter must necessarily feel some vindication from the fact that he obtained a court order requiring his reinstatement to the DVP Engineering job. *See, e.g.,* Pl. Reply Mem. at 5–6. But the value to him of this vindication is certainly not relevant for purposes of a Rule 68 analysis. Under Rule 68, only "the judgment finally obtained" is to be considered in the comparison with the offer of judgment. Thus, any incidental benefits to the judgment—such as a finding of liability or a ruling with precedential value to other potential litigants—are irrelevant. *See, e.g., Jolly,* 1999 WL 20895, at *7–*8; *accord Spencer,* 894 F.2d at 663–64 (determining that the lower court erred in "includ[ing] the non-judgment relief [the plaintiff] acquired as part of her 'judgment finally obtained'" and that "in making the comparison required by [Rule 68], a trial court should consider only the terms of the 'judgment finally obtained' by the offeree, and nothing more"). This principle is perhaps at odds with the reasoning of *Stokes,* where the court concluded that a job position offered was not more favorable than the position obtained after judgment simply because the latter position was the very one that the plaintiff asserted he had been denied as a result of discrimination. *See* 157 F.R.D. at 518. This Court rejects the reasoning of *Stokes,* however, in light of Rule 68's directive to consider simply whether the "judgment finally obtained" is more "favorable" than the offer. Such an analysis must be performed from an objective perspective, rather than being based on the subjective desires of the plaintiff. As such, a plaintiff's satisfaction in winning a favorable judgment has no bearing on the value of the relief obtained.

While the Court has discussed the value of each element of the final judgment separately, Rule 68 requires a comparison of the entire final judgment against the entire Offer. But stripped of the vindication value that might be attributed to Reiter's gratification in having obtained what he sought in a final judgment, the equitable elements of the final judgment together are of such limited value that the Court can only conclude that they would not be considered more favorable by an objective, reasonable person than a $10,001 cash payment. As a result, Reiter must bear any costs or fees he incurred after the making of the Offer.

*Conclusion*

The NYCTA must reimburse Reiter only for those attorney's fees and court costs incurred up to and including July 27, 2001. As described in a separate decision issued this date, Reiter's reasonable attorney's fees and court costs as of that date are $17,075.42. Accordingly, Reiter's application (Docket # 93) is granted to that extent. The Clerk is requested to enter judgment against NYCTA and in favor of Reiter for costs and attorney's fees in the amount of $17,075.42.

